**RALSTON PURINA COMPANY, A Corporation, Plaintiff,**

v.

**FAR–MAR–CO, INC., A Corporation, Defendant.**

**No. 76 426 C6.**

United States District Court, D. Kansas.

April 18, 1984.

1178

Randall G. Litton, Richard C. Cooper, Price, Heneveld, Huizenga & Cooper, Grand Rapids, Mich., Paul B. Swartz, Martin, Pringle, Schell & Fair, Wichita, Kan., for plaintiff.

Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., Warren N. Williams, Schmidt, Johnson, Hovey & Willians, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The complaint in this action, filed October 1, 1976, alleges that defendant has in the past and continues to infringe certain claims of U.S. Patent No. 3,940,495 issued on February 24, 1976. The complaint requests damages for past infringement in-

cluding the trebling thereof, an injunction enjoining future infringement by defendant, and attorney fees. The parties have agreed to reserve an accounting for damages until after a finding by the court of patent validity and infringement by Far-Mar-Co (Pretrial Order, pp. 1 & 2, Dk. # 172).

Defendant denies infringement, asserts affirmative defenses of patent invalidity and/or unenforceability, has counterclaimed for a declaration pursuant to 28 U.S.C. § 2201 and § 2202 of patent invalidity and/or unenforceability, and seeks to recover its costs and attorney fees. Defendant has also asserted counterclaims premised on the Sherman and Clayton Acts (Answer and Counterclaim, Dk. # 8). By earlier order of this court, these claims were separated from the patent issues and await trial at a later date (Dk. # 165).

The trial of this case spanned the period from August 2, 1982 through August 25, 1982. The record before the court includes the testimony of 14 witnesses appearing at trial, together with the deposition testimony of 44 persons. A relatively small portion of the deposition testimony was read at trial. Over 1300 individual exhibits were admitted, a few of which are duplicates and many of which are multiple page documents. On September 10, 1982, closing arguments were held, and modified findings of fact and conclusions of law were filed. The parties thereafter submitted post-trial briefs, the last of which was filed January 19, 1983. The court has carefully reviewed the testimony and exhibits, examined the proposed findings and briefs, and has endeavored to address all of the issues advanced at trial.

## FINDINGS OF FACT

### I. *General Findings*

1. Plaintiff Ralston Purina Company (hereinafter Ralston) is a Missouri corporation having its principal place of business at Checkerboard Square, St. Louis, Missouri 63188 (Pretrial Order Stipulation, Dk. # 172).

2. Defendant Far-Mar-Co, Inc. (hereinafter Far-Mar-Co) is a Kansas corporation having its principal place of business at 1600 N. Lorraine, Hutchinson, Kansas 67501 (Pretrial Order Stipulation, Dk. # 172).

3. The patent-in-suit, No. 3,940,495, entitled "Protein Product and Method of Forming Same," lists Ronald J. Flier as inventor and the Ralston Purina Company as assignee (R200).

4. U.S. Patent No. 3,940,495 issued from patent application Serial No. 324,295, filed January 17, 1973, which was a continuation of application Serial No. 600,471, filed December 9, 1966, which was a continuation-in-part of application Serial No. 381,-853, filed July 10, 1964 (Pretrial order stipulation, Dk. # 172). (Application No. 600,-471 will hereinafter be referred to as the "1966 application" or the "CIP application" and Application No. 381,853 will hereinafter be referred to as the "1964 application" or the "parent application.")

5. Plaintiff has been and remains the owner of the patent-in-suit since its issuance (Pretrial Order Stipulation, Dk. # 172).

### II. *The Invention of the Patent-in-Suit*

6. The invention which is the subject of the Flier Patent in this lawsuit is the first successful process, and resultant product, for directly and continuously restructuring oil seed particles, preferably soy particles, into a textured, chewable, fibrous, meat-like food product.

7. Restructuring is basically accomplished by extrusion working defatted, moistened soy particles under elevated temperature and pressure, into a flowable, plastic mass which is expanded into a restructured, fibrous, meat-like food product by suddenly releasing the pressure (R200; Tr.Tr. pp. 161–65).

8. Claims 1 and 18, two of the broader independent claims of the patent, read as follows:

"1. A method of treating a protein-containing vegetable material having no

more than a minor amount of fat and a protein content of at least about that of solvent-extracted soybean meal to form a porous fibrous food product comprising the steps of: moistening the protein-containing vegetable material to a moisture content of at least about 20% by weight and maintaining the pH of the mixture in a range which is slightly above or slightly below the neutral point of the vegetable material; mechanically working the moistened protein-containing vegetable material under temperatures in excess of 212°F. and elevated pressures; forcing the heated, pressurized, mechanically worked material through first restricted orifice means, maintaining the material under elevated temperatures and pressures as it emerges from said first restricted orifice means; the heat, pressure and mechanical working of the material prior to passage through said first restricted orifice means and the heat and pressure applied to said material after passage through said first restricted orifice means being such that upon release of the pressure it has the capability of forming a fibrous structure and then extruding the material through second restricted orifice means into an environment of a pressure substantially lower than said elevated pressures causing expansion of the product with moisture evaporation and the formation of a puffed and fibrous meat-like structure.

\* \* \* \* \* \*

18. The method of restructuring a soybean material to form a food product from a predominately solvent-extracted soybean material, comprising the steps of mixing said solvent-extracted soybean material having a protein content at least about that of solvent-extracted soybean meal with sufficient water to permit the resulting mixture to be passed through an extruder; confining the mixture within an extruder and increasing the pressure and temperature of the mixture while subjecting it to mechanical working until the mixture, upon release of the pressure, is capable of becoming a fibrous structure, said temperature during

said mechanical working being increased substantially above 212°F.; and forcing the mechanically worked, heated mixture under pressure through a restricted orifice, upon discharge from which the pressure is released, whereby the mixture is restructured into a puffed product of reduced density having a meat-like texture."

9. The screw-type extruder which may be employed to practice the process consists essentially of a barrel having a helical screw mounted inside which is rotated axially by a drive motor. One end of the barrel is closed off except for one or more restricted orifices through which the extruded product exits to the atmosphere. The other end of the barrel is open to permit flow of the material to be processed to the screw. Intermediate dies or restrictions such as steam locks may be provided along the length of the barrel to increase pressure and mechanical working of the material. The schematic drawing of the patent-in-suit shows an extruder having an intermediate flow-impeding restriction plate. The barrel, typically, is also provided with cooling and/or heating jackets along its length whereby, for example, the intake section is cooled by a medium such as cold water and the section near the final die is heated by a medium such as steam. *See generally* R200, cols. 5 & 6; R235; R236; F–1566.

*Pioneer Contribution to the Art of Texturizing Soy Protein*

10. Prior to Flier's process utilizing extrusion technology, the art of texturizing soy protein was limited to the spinning process invented by Robert Boyer and patented in 1954 (R213). Boyer, who conceived the notion that a textured, meat-like product could be obtained from soy material, utilized textile technology to create a spun textured product from soy isolate (R222, p. 10). The process, however, was, and remains, expensive, and as meat substitute the spun product has not been price competitive with real meat (Tr.Tr. p. 127).

11. Subsequent to the Flier invention, the term extruded textured vegetable protein products has become recognized by industry and government. Extruded textured vegetable protein products are made by mixing defatted soy flour of protein content about fifty percent, but varying as low as about forty-four percent and has high as about seventy percent, with water (and adding flavor, color and various nutrients as desired), and passing the mixture through an extruder under conditions which cause the mixture to puff upon exiting the extrusion die. This process causes the extruded product to be expanded and to exhibit a fibrous characteristic in its structure. After extrusion, the products are typically dried to approximately eight percent moisture and have a shelf life stability for at least a year under normal conditions of storage. They are capable of being rehydrated without losing structure and shape and have a chewy texture. One part of the dry product absorbs approximately two-three parts of water. The bacterial count is normally low. In addition to water absorption, they also have good fat absorptive properties. They can be colored and flavored to resemble many types of familiar foods. In the most popular commercial form, they contain approximately fifty percent protein (R260—Defendant's Admission 113).

12. Textured vegetable protein is utilized in the food industry as a meat extender and to some extent as a meat analog (Tr.Tr. pp. 129, 132–33, 542–45). The Department of Agriculture, in February, 1971, sanctioned the use of up to thirty percent of the product of the Flier invention in the place of meat in school lunch programs (R.226).

13. Both at trial and in prior publications, Dr. Aaron M. Altschul, a renowned nutritionist, scientific author, food scientist and former nutrition adviser to the United States Secretary of Agriculture praised the invention of texture in soy foods as a significant historical advance in food technology (Tr.Tr. pp. 134–35; R220, last page, last paragraph). Dr. Altschul has proclaimed that "[t]he ability to produce texture out of soy flour will probably rank with the invention of bread as one of the truly great inventions of food. It now becomes possible to separate protein and fat in products that are modeled after meats and it is possible to allow people the enjoyment that they expect from meat-like compounds and yet avoid the excesses in calories, fat, and high proportion of saturated fat that ordinarily come from such consumption." (R221, p. 29; Tr.Tr. page 136).

14. Defendant has promoted its Ultrasoy product in issue, made by the accused process, as described by Dr. Aaron M. Altschul, and with the depiction of Dr. Altschul along with the quotation, "I view the invention of textured soy protein foods along side the invention of bread as one of the great food developments of all time" (R14, p. 7; R13, p. 3).

15. The invention of extruded vegetable protein has been typified by defendant's own director of research, Dr. Wayne E. Henry, to a representative of the United States Department of Agriculture as both a "significant break through" and a "major break through" in the food industry (R30; R31).

16. The formation of fibrous, meat-like, textured plant protein food products by extrusion was characterized by defendant's technical expert, Dr. Judson Harper, at trial (Tr.Tr. p. 1779) and in a book he authored on extrusion of foods (F–1298, p. 90, para. 4) as having "greatly expanded the horizon for the production of price competitive plant protein" and being "the process system of choice."

17. The invention of the Flier patent represents a significant advance in the art of texturizing vegetable protein material and is accordingly entitled to the status of a basic, pioneer or generic contribution to the art (Tr.Tr. pp. 2374–78).

*Evidence of the Date of Flier's Invention*

18. The invention was first conceived and reduced to practice by Flier in St. Louis, Missouri, at the Ralston Purina

Company facilities in late January or February, 1963 (R202A; R203; Tr.Tr. p. 176).

19. A drawing of the equipment upon which the invention was practiced was made by Flier on March 5, 1963, as part of a written report entitled, "Progress Report for February" (R202P–Flier Exh. 2).

20. Another drawing was made on April 17, 1963, as part of a written disclosure of the invention to the legal staff of Ralston Purina Company. This drawing was also part of an April 22, 1963, report (R202P–Flier Exh. 7 & 8).

21. The first written description of the invention was hand written by Flier and was subsequently typed with the date February 13, 1963 (R202A; R203). The earlier handwritten document has not been found. A series of operational experiments was performed on the invention and was recorded in documents shortly thereafter (R203).

22. The conception and reduction to practice of the invention was first disclosed to laboratory personnel and to Mr. Flier's superior, Douglas Hale, on the day of the invention (Tr.Tr. p. 191). Testimony of the activities of these persons and independently generated documents corroborated the invention (R202P–Flier Exh. 3A–H, 6, 9, 13A–K).

23. Flier's conception of the invention in late January or February, 1963, is substantiated by the actual reduction to practice, eating of the product and testing of the product by Flier (Tr.Tr. pp. 187–92), Mr. Hale and others (R202K) in the laboratorial pilot plant, correspondence on February 18, 1963, by Mr. Hale to the legal staff of Ralston Purina Company (R202P–Flier Exh. 9), correspondence on March 5, 1963, describing the invention by Flier to Ralston Purina management (R202P–Flier Exh. 2) and institution of a dog digestion experiment (R202P–Flier Exh. 3A–H, 13A–K).

24. Diligence was exercised from the start of the project in January/February, 1963, until actual reduction to practice (R202A).

25. Flier and other employees of Ralston Purina Company were diligent in efforts with regard to what they considered the "exciting" invention, as evidenced by continuous activity thereafter in the weeks and months following the initial discovery. A record of these efforts is set forth in the Interference 96,355 record, particularly R202P–Flier Exh. 1–13 and testimony relating thereto (R202J, K, L).

26. The Flier invention was reduced to practice in late January/February, 1963, by processing moist, solvent defatted, fifty percent protein, soybean meal, using a screw-type extruder, as set forth in R202P–Flier Exhibits 1A and 1B (R202A).

III. *Prosecution History of the Patent-in-Suit*

27. As already indicated, Flier applied for a U.S. patent on July 10, 1964 (R255). The examiner rejected the originally presented claims on May 9, 1967 (R255, p. 19), and also amended claims on November 28, 1967, in a final rejection (R255, pp. 49–52). While this application was pending, Flier filed a continuation-in-part application on December 9, 1966 (R256). Following final rejection of the claims as amended in the 1964 application, and after a personal interview with the examiner on March 25, 1968, the 1964 case was abandoned. (R255, pp. 54–56).

28. The examiner rejected the claims as originally presented in the CIP application, noting that they did not materially differentiate from claims disallowed during prosecution of the parent application (R256, p. 36). Thereafter, following another personal interview with the examiner, certain claims were amended in a responsive action of April 10, 1968, and certain of these claims were allowed in an office action dated May 14, 1968 (R256, p. 66).

*The Interference and Peoria Litigation*

29. Interference 96,355, styled *Wilding v. Flier v. Atkinson*, was declared in the United States Patent and Trademark Office on May 23, 1968, involving the pending patent applications of Morris Wilding (assignor to Swift & Co.), Flier and William Atkinson (assignor to Archer-Daniels-Mid-

land Co.) § 9R202B). The proceeding was initiated to determine priority of invention between parties whose applications were deemed to contain common patentable subject matter (See 35 U.S.C. 135; 37 CFR 1.201).

30. The sole count of the interference was a phantom count, prepared by the patent interference examiner (R202B) and determined by him to be patentable. The count read as follows:

The process of preparing an expanded food product which comprises mechanically working a protein mix of a solvent-extracted oil seed proteinaceous material having protein concentrations of at least 30 percent and water in a concentration of 15 to 60 percent, at a temperature above 200°F. and under elevated pressure sufficient to convert said mix into a flowable substance, extruding said flowable substance through an orifice into a medium of lower pressure.

Atkinson was awarded senior party status, being accorded the benefit of his earliest application, filed May 21, 1964. Flier was accorded intermediate status, having been accorded the benefit of his earliest application, filed July 10, 1964. Wilding was accorded juniormost status by reason of his filing date, March 1, 1965 (R202A).

31. Extensive discovery was undertaken by each of the parties to the interference. Also, considerable testimony was offered, as reflected by Exhibit R202, the interference record. Priority of the count was eventually awarded to Flier in a detailed opinion issued by the Board of Patent Interferences on August 13, 1971 (R202A). The primary bases for this award, regarding Flier's dates of conception and reduction to practice, are essentially as set forth in Findings 18–26, *supra*.

32. The decision of the Board of Patent Interferences was appealed by both Wilding and Atkinson to the United States District Court for the Southern District of Illinois in Peoria. At the time of these appeals, there were also pending in that court two suits for patent infringement previously brought by ADM against Ral-

ston and Swift and Company. The basis for the latter suits was United States Patent 3,488,770, owned by ADM, which had matured during the time period in which the interference was pending in the PTO from an application which was styled a continuation-in-part of the application involved in the interference. This continuation-in-part application claimed a particular type of product which could be made by practicing the process which formed the count of the interference (F–1295).

33. Extensive discovery was again undertaken by each of the parties to the Peoria litigation. The discovery on occasion ranged beyond the activities of the parties to include the prior work of certain individuals who, along with Atkinson, are claimed by defendant to have practiced the process of the patent-in-suit before Flier. This discovery included the deposing of Oak Smith, an associate of Wenger Manufacturing (R265M–R2650), as well as Sheldon Baer, of Anderson, IBEC (formerly the V.D. Anderson Company) (R265F).

34. Just prior to trial, settlement discussions were held at the request of the court, as a result of which the Peoria litigation was settled on April 6, 1972. Under the settlement agreement, the parties executed a cross-licensing arrangement with each party granting to the other license rights under their respective patent or patent applications then in controversy in the litigation. The settlement agreement provided that each party would grant to any third party making a written request a nonexclusive license under the claims of any subsisting or future patent. The agreement also specified certain terms of such a license (F–1146).

### Continued Prosecution of the Ralston Application

35. Prosecution of the Flier 1966 application was stayed during the pendency of the interference appeal (37 CFR 1.212). On July 13, 1972, counsel for Flier filed with the primary examiner a document, styled "Condensed Summary of District Court Record" (R264A) and numerous deposi-

tions, exhibits and specimens referenced in that document (R265A–R265W60 and R266A–R266EE). This document contained, in addition to the summary of the Peoria discovery, a discussion of the positions of the parties and the testimonial, documentary and physical evidence each urged in support of their position at the time of the Peoria settlement.

36. Also filed at this time, accompanying an amendment submitting modified claims for prosecution, was a list of patent and publication references deemed pertinent to these claims (R256, pp. 119–34). These claims and cited references, however, were not evaluated by the examiner. Since, at the time the interference was declared, certain claims of the CIP application had been allowed in a final office action (see R256, p. 66), the examiner held that further prosecution of the 1966 case was closed (R256, pp. 135–37).

37. Flier thereafter filed a substitute oath expressing his concern that, as to subject matter of the allowed claims not common to his parent application, he had reason to believe this matter may have been in public use or on sale in the United States more than one year prior to the filing of the CIP application. As the examiner noted in a responsive action dated March 2, 1973 (R256, pp. 145–52), Flier's concern related to certain alleged sales of products by ADM and Swift before December 8, 1965. The examiner determined the effective date of the then allowed claims to be the filing date of the CIP application, and required an investigation into the facts surrounding these sales.

38. Flier responded with a new substitute oath expressing his belief that subject matter not common to the parent application was not patented or described in any printed publication in any country, or in public use or on sale in the United States more than one year before the filing of the CIP application (R256, pp. 157–59). In an accompanying response, it was explained that no evidence was produced by these companies establishing what steps, materials, and conditions were employed in the

manufacture of products allegedly sold (R256, pp. 153–56). On May 4, 1973, the examiner found the substitute oath acceptable (R256, p. 162).

39. Meanwhile, Flier had filed a continuation application on January 17, 1973 (R257) containing 34 claims, and an amendment on March 26, 1973 containing 19 additional claims which were similar to the claims asserted in the 1966 application. The remarks accompanying this amendment included a list of prior art patents and referred the examiner to the Condensed Summary of District Court Record filed in the CIP application (see Finding No. 35, *supra*).

40. In a communication filed on July 9, 1973, and prior to any PTO action on the 1973 continuation application, the examiner was apprised of a lengthy list of prior art references in addition to those previously cited (R257, pp. 56–73). Copies of these references were submitted at this time and in a subsequent communication of November 9, 1973. The July communication also addressed sales of products of Swift and ADM which were the subject of the oaths filed in the CIP application and noted above. Among the prior art references cited was ADM Dutch patent application 6506477 which was specifically identified as having been published and as corresponding to the Atkinson U.S. patent application involved in the interference proceeding and Peoria litigation (R257, pp. 60–61). The Dutch application had been published on November 22, 1965, and the July communication indicates that a copy was attached thereto. The record discloses that this reference was brought to the attention of the examiner after a discovery that the application had been published (F–615).

41. During the ensuing two years, certain of the claims were revised in response to the examiner's inquiry, and continued attempts were made by attorneys for Flier to discuss and distinguish the various prior art references previously cited by counsel, including the Oak Smith work. On two occasions, however, the examiner indicated that the manner in which these references

had been submitted was not in accordance with patent office procedure (Manual of Patent Examining Procedure § 707.05(b) required an applicant to list the five most pertinent references unless a satisfactory explanation is given why additional citations are necessary). On one occasion, in a response of April 5, 1974 to the communications filed in 1973, he noted that not all the references appeared pertinent; that some references had not been submitted and some foreign patents were not translated. Accordingly, he added, the art recited had not been fully considered.

42. Prosecution of the Flier application continued until August 14, 1975, at which time the examiner issued a notice of allowance. The Flier patent (R200), here in suit, was issued February 24, 1976. It contains fifty-two claims, twenty-three of which are alleged in this action to be infringed by Far-Mar-Co. Twenty-one of these claims are process claims. The remaining two are product-by-process claims.

IV. *The Accused Product and Process*

43. The accused product manufactured by the accused process is sold by defendant under the trade designation Ultra-Soy (R260-Defendant's Admission 1).

44. Defendant has marketed Ultra-Soy since about April, 1970, to the present (Tr.Tr. pp. 1085, 1099; R260–Defendant's Admission 72).

45. Defendant first learned of the process of extruding vegetable proteinaceous material in October, 1969 (R260–Defendant's Admission 101).

46. Defendant sells Ultra-Soy both in the United States and abroad (R260–Defendant's Admission 114).

47. Ultra-Soy is sold primarily as an ingredient for food processors to incorporate in their products as a meat extender (R260-Defendant's admission 73; Tr.Tr. pp. 542–44).

48. Certain Ultra-Soy products produced by defendant are marketed as "meat analogs" such as bacon flavored chiplets, breakfast bits, pepperoni flavored chiplets

and green bell pepper analogs (Tr.Tr. pp. 542–44; R260-Defendant's Admission 109).

49. Ultra-Soy is also sold by defendant as a substitute for some of the meat in food formulations (Tr.Tr. pp. 542–46; R260–Defendant's Admission 49).

50. Ultra-Soy products are sold by defendant in a dry state (Tr.Tr. pp. 1147, 1149; R260-Defendant's Admission 112).

51. Ultra-Soy is a nutritious product which can be stored without refrigeration in its dry condition (R260-Defendant's Admissions 87 & 88). It is capable of storage in the dry state for up to a year without refrigeration and has been so promoted by defendant (R260–Defendant's Admissions 32 & 33).

52. Ultra-Soy is capable of rehydration from the dry state in cold water and has been so promoted by defendant (R260–Defendant's Admissions 34 & 35).

53. Ultra-Soy can be rehydrated from its dry condition without cooking, heating, autoclaving or steaming (R260-Defendant's Admission 89).

54. Ultra-Soy has been promoted by defendant as having fibrous character (R260-Defendant's Admission 26), and as having meat-like texture (R260-Defendant's Admission 7).

55. Defendant has promoted its Ultra-Soy by advertising that its "fibrous character can simulate, for example, the texture of meat in patties, meatballs, meatloafs, taco fillings, and pizza toppings" (R260-Defendant's Admissions 28 & 29).

56. Defendant has advertised Ultra-Soy as exhibiting the unique texturized structure that provides excellent fact and moisture retention properties (R260-Defendant's Admissions 15 & 66), and has promoted the product as having a high quality protein and good mouth feel (R260-Defendant's Admissions 30 & 31).

57. Ultra-Soy is promoted by defendant as being capable of saving as much as twenty-five percent on meat costs while actually increasing nutritional value when substituted for some of the meat in the

**1192**

meat formulation (R260-Defendant's Admission 50).

58. Ultra-Soy is porous, puffed and expanded (R260-Defendant's Admissions 38, 40 & 41).

59. The food product Ultra-Soy has since about 1973 been commercially promoted by defendant as made from the proteinaceous fraction derived from basic soybean processing, moisturized, subjected to pressure and high temperature and extruded (R260-Defendant's Admission 64).

60. Defendant's Ultra-Soy product has been commercially successful with a relatively minimal amount of advertising (R260-Defendant's Admissions 116, 117; Answer to Interrogatories 135–138).

61. At the time of the filing of this lawsuit, the two Wenger X–200 extruders with which defendant commercially produced Ultra-Soy were equipped with a total of four steam locks each, with one situated between each two-screw sections (Defendant's Admission 131; F–1566; Tr. pp. 1117, 1121).

62. The evidence indicates that subsequent to the commencement of this case, one of the Wenger X–200 extruders was modified by defendant to operate without steamlocks. The court has, nevertheless, entered certain findings of fact as to this extruder based on evidence presented by both parties. However, the court has not entered findings relative to the use of another extruder, the Anderson 10 inch, which the court permitted defendant to refer to over the objection of plaintiff. The infringement issue, as to potential use of this extruder to practice the process in issue, has not been properly joined. Nor has there been discovery to permit a reasonable determination whether utilization of this extruder infringes the claims of the patent-in-suit.

63. Each steam lock in defendant's Wenger X–200 extruder used in the production of Ultra-Soy restricts the flow of material through the extruder barrel (Tr.Tr. pp. 1310, 563) and constitutes a restricted orifice or restricted orifice means (Tr.Tr. pp. 715–16, 743, 751, 762–63, 776).

64. The barrel diameter of the Wenger X–200 extruders decreases at the discharge end of the barrel while the root diameter of the screw in the discharge end section increases, both of which restrict the flow of material through the barrel and constitute restricted orifice means in addition to those formed by the steam locks (Tr.Tr. pp. 1109, 1131, 1379–80, 1633–34, 1386; F–1566).

65. In each of the two extruders upon which defendant commercially produces its Ultra-Soy product, there is a space between the terminal end of the screw and the discharge orifice closest to the terminal end of the screw (R260-Defendant's Admission 128). This space is enlarged relative to the restricted orifice means defined in Finding No. 64 (F–1566).

66. The extruder die located at the discharge end of the Wenger X–200 extruder barrel contains restricted orifices and restricts the flow of material through the barrel (Tr.Tr. pp. 1131–32, 1385–86, 1634; R260-Defendant's Admission 67).

67. The extruder die of the Wenger X–200 extruders constitutes a restricted orifice means (Tr.Tr. pp. 718, 737, 744, 809–10; R260-Defendant's Admission 67).

68. An elongated zone of confinement is formed between the last flow restricting steam lock and the extrusion die of the Wenger X–200 extruder utilized by defendant. A second zone of confinement is formed on the inlet side of the last steam lock (Tr.Tr. pp. 751–52, 763, 774, 790–91, 809–10; F–1566). The Wenger X–200 extruder screw extends into the zones of confinement (Tr.Tr. pp. 1120–21, 811; F–1566). Additionally, the extruder screw of the Wenger X–200 extruders used by defendant terminates a distance from the extrusion die, creating an elongated zone of confinement between the extruder die and the flow restricting discharge section of the screw (Tr.Tr. pp. 1131, 589, 753; F–1566). A second elongated zone of confinement is formed on the inlet side of the flow restricting discharge section of the screw (Tr.Tr. p. 753; F–1566).

69. The material passing around the steam locks in the Wenger X–200 extruder utilized by defendant is subjected to reduced pressure at the steam lock (Tr.Tr. p. 565) and therefore expands in stages to some degree as it passes through the extruder (Tr.Tr. p. 742). The pressure is maintained at an elevated pressure and temperature after passage around the steam lock (Tr.Tr. p. 565, 1121, 752–53).

70. Defendant manufactures Ultra-Soy by process steps which utilize a vegetable soybean material as a starting material (Tr.Tr. pp. 709, 1108). Soybean materials carry common designations in the trade which merely differentiate between the particle size of the material, with soy flour having a smaller particle size than soy meal (Tr.Tr. p. 555). For purposes of the Flier patent, soy flour is the same as soy meal (Tr.Tr. pp. 729, 741, 760, 768). In its process for manufacture of Ultra-Soy using the Wenger X–200 extruders, defendant utilizes soybean material having a soy flour particle size (Tr.Tr. p. 1108; R260-Defendant's Admissions 24, 67).

71. The oil content of the soybean material utilized by defendant in its production of Ultra-Soy is reduced to a minimal amount by solvent extraction, less than one percent (Tr.Tr. p. 1117) or preferably approximately 0.5% (Tr.Tr. p. 730; R44–48).

72. The soybean material utilized by defendant, having a protein content ranging from about 51.6% to 55.6%, and typically 54% (R260-Defendant's Admissions 67, 80; Tr.Tr. p. 1117), has a protein content at least that of solvent-extracted soybean meal, or at least about fifty percent (Tr.Tr. pp. 695, 711, 748).

73. Sufficient water is added to the soybean material by defendant to allow the material to pass through an extruder in the production of Ultra-Soy (Tr.Tr. pp. 696, 1118, 1238; R260-Defendant's Admissions 67, 81). In the process utilizing a Wenger X–200 extruder defendant utilizes soybean material having an original moisture level of typically 4% to 6% (Tr.Tr. p. 1117). During the production of Ultra-Soy, the soy material moisture is increased to produce a mix having a total moisture content in the range of about 23% to about 30% (R260-Defendant's Admissions 67, 81), and typically approximately 28% (Tr.Tr. pp. 1108, 1118), which may vary by a plus or minus one percent depending upon the particular die used (Tr.Tr. pp. 1243–44). During the production of Ultra-Soy, defendant does not specifically measure the added or total moisture content, but adjusts the added moisture in response to fluctuations in end product characteristics (Tr.Tr. pp. 1245–1247). Defendant adds to the soy material moisture content at least about 25% (Tr.Tr. pp. 783–84, 1117–18, 2343–44).

74. Defendant, when manufacturing Ultra-Soy, uses moistened soy flour at its natural pH, generally in the range of 5 to 8, and in the range of 6.6 to 8 (Tr.Tr. p. 595; R260-Defendant's Admission 84). The Ultra-Soy product typically has a pH of 6.5 (R260-Defendant's Admission 69; R12).

75. During the commercial production of Ultra-Soy by defendant, the soy material mix is fed into an extruder containing a screw which mechanically works the soy material mix, subjecting the mix to increased temperature and pressure (Tr.Tr. p. 1134; R260-Defendant's Admission 67).

76. While confined within defendant's extruder, the mix is heated to a temperature of 320–370°F. (R260-Defendant's Admission 67), which is substantially in excess of 212°F. (Tr.Tr. pp. 761–63). At or near the extrusion die of the Wenger X–200 extruders the pressure increases to a range of 120 to 175 p.s.i.g. (Tr.Tr. 1123; R260-Defendant's Admission 67).

77. It is impossible to determine precisely what occurs within the extruder barrel during the extrusion of soybean material (Tr.Tr. pp. 636–37, 643, 1746). It is possible to open the barrel of the Wenger X–200 extruder, and a variety of theories have developed as to what occurs within the extruder based upon the remains after the pressure and temperature have been decreased and the barrel opened (Tr.Tr. pp. 1250, 1259, 1690–91). Regardless, the soybean material undergoes a pronounced, dramatic physical change between the in-

troduction into and exit from defendant's Wenger X–200 extruder (Tr.Tr. p. 1279). Both plaintiff and defendant agree that the soybean material becomes a plasticized or molten, flowing mass (Tr.Tr. pp. 621, 1141, 1253). The mass is forced through openings in the extrusion die (Tr.Tr. pp. 1132–33), at which point the pressure is suddenly released (F–1568), causing the material to expand (Tr.Tr. pp. 1132–33, 1389), and the extruded end product is no longer in the same physical state after exiting the die (Tr.Tr. pp. 1263–64).

78. In defendant's process for manufacturing Ultra-Soy, the soybean material is physically changed from a flour form to a textured soy protein product (R260-Defendant's Admission 86).

79. In defendant's process for manufacturing Ultra-Soy, the pressure on the soybean material, in excess of ambient pressure, is suddenly released as it exists from the extruder die, the soybean material is puffed or expanded after it exits from the extruder die, and there is evaporation of moisture from the soybean material as it exits from the extruder die (Tr.Tr. p. 1389; F–1568; R260-Defendant's Admissions 67, 85).

80. In defendant's process for manufacturing Ultra-Soy, soybean material is confined within an extruder while being subjected to sufficient mechanical working at elevated temperatures and pressures for a sufficient length of time that upon release of the pressure it is capable of becoming a fibrous structure (Tr.Tr. pp. 702–03, 716–17, 725, 736, 777, 786, 1132–33, 1263–64).

81. It is impossible to determine at precisely what point in defendant's process or in what amount fibers are formed, but even the theory presently held by defendant's technical expert agrees some percentage of fibers are formed in the extruder die orifice and outside the extruder during expansion (Tr.Tr. pp. 1730, 1737–41).

82. The Ultra-Soy product produced by defendant is severed into chunks after discharge from the extruder and then dried (Tr.Tr. pp. 561, 1131, 1146–47).

V. *Infringement*

83. Plaintiff's expert, Mr. Donald Zarley, presented a detailed analysis of each of the asserted claims and explained why, in his opinion, they were infringed by the accused Far-Mar-Co process and product. The court finds Mr. Zarley's conclusions, based upon the evidence, both credible and persuasive.

84. The court has considered defendant's arguments concerning file wrapper estoppel and, in particular, whether plaintiff is estopped from asserting infringement of certain claims calling for control or maintenance of the pH value within a specific range. In the first place, the court considers defendant's strict observance of the pH factor a literal infringement of this claim element. In any event, a claim construction that one can maintain or control the pH value without the overt act of adding a base or acid was never surrendered by Flier, during prosecution of the patent, to distinguish his process over the prior art. See R256, pp. 22–28, 36–39, 44–65. Though he was to later emphasize that the pH was not the point of invention, Flier's early efforts to distinguish the prior art cited by the examiner emphasized the effect of the pH value on expansion and texturization during extrusion processing. While, as the specification illustrates, the pH can be altered or adjusted to enhance fiberization, and certain claims require this step, the court does not interpret the claims calling for controlling or maintaining the pH value to require the addition of a substance to the starting material.

85. As to the claim language regarding formation of the "fibrous structure," the court does not interpret the claims of the patent-in-suit as positing a particular situs, inside or outside the extruder of fiber formation; they require only that the starting material assume a fibrous condition at least by the time it emerges from the final die (Tr.Tr. 827). As Mr. Zarley concluded: "the important phenomenon is creating the fibrous product, and it is not critical to the invention as to where that fibrous phenom-

enon takes place." (Tr.Tr. p. 873). Interpreting the claims in light of the specification and the file wrapper history, the "fibrous structure" referenced in the claims refers to an end product which is both fibrous and expanded, and does not preclude the possibility of some texturization occurring inside the extruder.

86. The process by which defendant manufactures its Ultra-Soy product falls within the language stating temperatures "in excess of 212°F." set forth in claims 1, 2, and 10 (Tr.Tr. pp. 714, 750); stating temperatures "at least about 212°F." set forth in claims 8 and 9 (Tr.Tr. p. 735); and temperatures substantially above or in excess of 212°F. set forth in claims 11–20, 22, 23, 25, 29–31 (Tr.Tr. pp. 703, 724, 761–62, 774, 786). *See also* R261.

87. The process by which defendant manufactures its Ultra-Soy product falls within the language set forth in the claims in suit stating an elevated or increased pressure (Tr.Tr. pp. 702, 716, 724–25, 735–36, 750, 762, 775, 785). *See also* R261.

88. The process by which defendant manufactures its Ultra-Soy product falls within the language set forth in claims 1, 2, 8 and 9, stating a moisture content of at least about 20% by weight (Tr.Tr. pp. 713, 733); claims 10, 11, 12 and 13, stating a moisture content at least about 25% by weight (Tr.Tr. pp. 748–49, 760–61); and claims 14, 29, 30 and 31, stating a moisture content in the range between about 20% and about 40% by weight (Tr.Tr. pp. 723, 773). *See also* R261.

89. The process by which defendant manufactures its Ultra-Soy product falls within the language set forth in claims 18, 22, 23 and 25, stating adding sufficient water to permit the resulting mixture to be passed through an extruder (Tr.Tr. p. 696); claims 15, 16 and 17, stating an added moisture content at least 25% by weight (Tr.Tr. pp. 783–84); claim 20, stating an added moisture content of approximately 25% by weight (Tr.Tr. pp. 802–03); and claim 19, stating added moisture in the range of 20% to 30% (Tr.Tr. pp. 801–02). *See also* R261.

90. The process by which defendant manufactures its Ultra-Soy product falls within the language set forth in claims 1 and 2, stating controlling the pH value to slightly below or slightly above the neutral point of the material (Tr.Tr. p. 713); claims 8, 9 and 22, stating controlling the pH to a value between 5 and 8 (Tr.Tr. pp. 733–34, 804); and claim 23, stating a pH in the range of 6.6 to 8 (Tr.Tr. pp. 804–05). *See also* R261.

91. The process by which defendant manufactures its Ultra-Soy product falls within the language set forth in claim 2, stating a fat content of approximately 0.5% (Tr.Tr. p. 730); and as set forth in the remainder of the process claims in suit, stating no more than a minor amount of fat or solvent extracted soybean material (Tr.Tr. pp. 694, 709–10, 722, 733, 747, 758–59, 771–72, 782). *See also* R261.

92. The process by which defendant manufactures its Ultra-Soy product falls within the language set forth in claims 1, 2, 10–20, 22, 23, and 25, stating a protein content at least about that of solvent-extracted soybean meal (Tr.Tr. pp. 695, 711, 747–48, 760, 772–73, 783); and set forth in claims 8 and 9, stating a protein content at least about 50% (Tr.Tr. p. 732). *See also* R261.

93. The process by which defendant manufactures its Ultra-Soy product falls within the language set forth in claims 1, 2, and 9, stating passing the material through a first and second restricted orifice means (Tr.Tr. pp. 716–18, 743–44); claims 10, 11, 12 and 13, stating an elongated zone of confinement between the first and second restricted orifice means (Tr.Tr. pp. 750–54, 763–65); claims 14, 16, 17, 30 and 31, stating a pair of zones of confinement separated by a restricted orifice (Tr.Tr. 774–79, 790–92, 808–10). *See also* R261.

94. The process by which defendant manufactures its Ultra-Soy product falls within the language set forth in the claims, stating confining the mixture within an extruder and increasing the temperature and pressure while subjecting it to mechanical

working until the mixture, upon release of the pressure, is capable or has the capability of becoming a fibrous structure (Tr.Tr. pp. 702–03, 717, 725, 736, 777, 786). *See also* R261 corroborating a conception or reduction to practice prior to Flier's successful work. Defendant has neither bridged this evidentiary gap, nor persuaded this court that the experimental runs relied upon involved the practice of the patented process herein issued.

95. The process by which defendant manufactures its Ultra-Soy product falls within the language set forth in claims 10 and 11, stating advancing the material through the zone of confinement for a period of time sufficient to cause the material to have a fibrous nature as it is finally discharged (Tr.Tr. pp. 753, 764). *See also* R261.

96. The process by which defendant manufactures its Ultra-Soy product falls within the language of claims 1, 2, 8–20, 22, 23, 25 and 29–31 of the Flier patent (Tr.Tr. pp. 706, 720, 727–28, 730, 738–39, 744, 756, 766, 768–69, 779, 788–89, 792–94, 802–05, 807, 810–11).

97. The product Ultra-Soy falls within the language of claims 32 and 33 of the Flier patent (Tr.Tr. pp. 813–16).

98. Claims 1, 2, 8–20, 22, 23, 25 and 29–33 of the Flier patent are infringed by defendant's manufacture, use and sale of its Ultra-Soy product.

## VI. *Validity*

### A. *Alleged Prior Invention and Use*

99. Flier was the first inventor of the process which is the subject of this patent and the product produced by this process.

### *The Parties to the Interference*

100. With regard to the prior work of William Atkinson, no convincing evidence has been produced by defendant to cause the accuracy of the Board of Patent Interferences opinion, issued August 13, 1971, to be questioned. In that opinion, the Board reviewed the work of Atkinson, including the experimental runs 2669 and 2671 relied upon by defendant in this case, and found, among other deficiencies, a lack of evidence corroborating a conception or reduction to practice prior to Flier's successful work. Defendant has neither bridged this evidentiary gap, nor persuaded the court that the experimental runs relied upon involved the practice of the patented process here in issue.

101. Additional evidence not considered or relied upon by the Board of Patent Interferences is illuminating, and further buttresses the conclusion reached by the Board. This evidence includes: (a) a patent proposal submitted by Mr. Atkinson on December 23, 1963, indicating that a hydratable, meat-like product had been made on December 3, 1963 (R202Q–Flier Rebuttal Exhibit E); (b) Atkinson notebook # 28, reporting on pages 106–112 that on December 3, 1963, he had extruded Ardex 700 at the Polytech Company in Minneapolis on a plastics extruder commenting, with regard to the resultant product, "This material didn't disintegrate to the usual mush" (R202Q-Flier Rebuttal Exhibit D-15; F–766, p. 108); (c) Atkinson notebook # 28 also reports on an experiment conducted December 10, 1963, involving the running of Ardex 700 on a "plastics" extruder. Mr. Atkinson's contemporaneous comments on the resultant product after hydration were, "The extrudate absorbed all of the water and possessed the appearance of tender cubes of beef. Fibrous structure looked *exactly* like cubes of meat. Texture and mouth disappearance simulate real meat *exactly*. Texture excellent even after severe autoclaving condition" (Emphasis in original) (R202Q–Flier Rebuttal Exhibit D–22; F–766, p. 117). No such comments appear in the Atkinson notebooks prior to this date (*See* F–701, F–766); (d) ADM Research Quarterly Report for the period October-December, 1963, referred to by the Board on a related issue, states at page 16:

> Beef flavored extrusion materials prepared from Ardex 700 and Ardex 550 were processed through the ADM Prodex plastics extruder. The machine subjected the protein material to high shear, com-

pression, and temperature. The resultant extrudate possessed fibrous textures. The proportions were unique for such materials as Ardex. 700 and Ardex 550. The extrudates hydrated and bound 3.5 parts of water. The hydrated materials maintained their integrity during boiling and autoclaving under such severe conditions as 120 minutes at 120 P.S.I.

The hydrated extrudates possessed a fibrous texture which resembled boiled beef. The chewiness of the material and mouth disappearance simulated high quality beef.

These materials are truly unique, interesting, and worthy of exploitation.

A patent disclosure is being prepared. (R202U–Wilding Rebuttal Exhibit C.)

102. Mr. Atkinson, during cross-examination in January, 1982, revealingly stated with respect to the run made at the Polytech Company on December 3, 1963: "... [T]hat was a real moment in my life when I autoclaved those under extreme temperature conditions and got the meat-like material that, in my opinion, completely duplicated beef" (F–803, p. 88a).

103. There is testimony in the record regarding alleged samples of Mr. Atkinson's runs 2669 and 2671 conducted in February, 1962. The sample from run 2669 first surfaced in 1971 following the decision by the Board of Patent Interferences (F–328, pp. 308–15). The sample from run 2671 first surfaced, insofar as the record indicates, in January, 1982 (F–756, pp. 12–24). Mr. Atkinson's testimony indicates that he regained possession of these samples in 1977 when a filing cabinet at his former employer was being cleaned out and has since kept them in his basement (F–756, pp. 12–13; F–793, pp. 46–47). These samples were the subject of considerable dispute at trial. The court has closely reviewed the deposition testimony to determine what weight, if any, should be accorded them. Their origination and history is, to say the very least, unclear (F–328, pp. 308–15; F–756, pp. 12–24; F–793, pp. 46–62; Atkinson Dep. July 13, 1982). This history, coupled with the fact that

apparently certain reruns of experiments 2669 and 2671 were made by Atkinson in 1971 and Atkinson's own testimony that he probably could not tell the rerun extrudate from the extrudate of the original runs (Atkinson Dep. July 13, 1982, pp. 21, 30–31) compels the court to disregard these samples and the testimony concerning them.

104. Mr. Atkinson, for some time prior to conducting the February, 1962 experiments 2669 and 2671 involving 70% soy protein concentrate, had been running extruder experiments which utilized as a starting material isolated soy protein. The resultant extrudate was not expanded and, as described by him, chewed like "little rubber erasers" (R202M, p. 382; F–328, pp. 288–90; F–793, pp. 73–74). It clearly did not possess the meat-like properties of the extrudate materials produced by the process which is the subject of this suit, and the contrary has not been asserted by the defendant in this litigation.

105. Mr. Atkinson, between the dates of his runs 2669 and 2671 and December, 1963, ran approximately 280 separate experiments, of which approximately 180 were extrusion experiments. He never attempted during this period of some nineteen months to duplicate either of runs 2669 or 2671 nor, for that matter, to run any starting material other than isolate through the bench-top extruder, the extruder he used in runs 2669 and 2671 (F–803, pp. 9a–88a). The court finds it somewhat difficult to believe that if runs 2669 and 2671 were the successes which they are now portrayed to be he would not have repeated or attempted to duplicate them during this time period. Apparently, at least as of July, 1962, he considered the qualities of the soy isolate extruded product (the little rubber erasers) superior to the product obtained from prior extrusion experiments utilizing soy concentrate (F–708, p. 509–545).

106. Nine runs were made by ADM personnel during this nineteen-month period on what has been referred to as the pilot plant extruder using non-isolate soy materials as a starting material. The lab sheets

reporting these runs reveal no comments whatever as to the existence of texture, chewiness, meat-like properties or the like in the resultant extrudate. Only two of these runs, moreover, were made prior to the conception and reduction to practice of the invention by Flier in early 1963 (F–830, pp. 9a–88a).

107. Neither these runs nor those performed by Mr. Atkinson in February, 1962, constituted a conception or reduction to practice of the invention here in suit. The court concurs with the opinion of the Board of Patent Interferences rendered in August, 1971, that Flier vis a vis Atkinson was the first inventor of the subject matter of the patent in suit.

108. Finally, it was admitted by counsel for defendant at trial that Mr. Atkinson, who was expected to testify live, made alterations in ink in his 1962 notebook on the pages reporting experiments 2669 and 2671 the day before he was to testify (Tr. Conf. in Chambers, August 12, 1982, p. 6, lines 18–25, p. 7, lines 1–17). Counsel for defendant thereupon decided not to call Mr. Atkinson but to rely instead upon the numerous volumes of his deposition testimony taken over a period of approximately thirteen years. While Mr. Atkinson's activities during the course of the trial are not necessarily representative of his prior activities with respect to his laboratory journals, they furnish further reason to question the accuracy of his deposition testimony, particularly as elicited in 1982, some twenty years after the events in question. Moreover, the court notes an enhanced level of descriptiveness in Atkinson's recent testimony as to process and product characteristics of extrusion runs in 1962. The court has considered this in the light of the passage of a considerable period of time between testimony first elicited during the interference proceeding and 1982, and the intervening preparation for the Peoria trial and this litigation (F–797; F–793, pp. 45–46).

109. The record does show, however, that Atkinson, a man of considerable skill in the art, worked for a period of nearly three years prior to arriving in December, 1963, at the process which was the subject of the interference count and which forms the basis for the present lawsuit (R202C–R202H).

110. The Board of Patent Interferences dismissed the case for Morris Wilding on the ground that he had failed to prove even a conception date prior to the Flier reduction to practice date (R202A). There is nothing in the record of this case that would bring that finding into question.

### Oak Smith-Wenger

111. Defendant offers, for purposes of establishing both prior invention of the Flier process under 35 U.S.C. § 102(g) and prior use of the process under 35 U.S.C. § 102(a), the collaborative effort of Oak Smith, of Wenger Manufacturing, and the United States Department of Agriculture on December 20, 1961. On that date, following an extrusion run on "full-fat" soy, Mr. Smith, at the request of the Department of Agriculture, conducted a run using defatted soybean material supplied by the U.S.D.A. (F–1; F–346).

112. The nature of the product resulting from this experiment is unclear. Contemporaneous run sheets failed to describe the product's physical structure (F–3; F–4), and correspondence of Oak Smith, as well as U.S.D.A. reports following the run, revealed no recognition of any significant results (F–220; F–350; F–351). In fact, the correspondence and reports clearly indicate that the focus of attention was on the immediately preceding full-fat soy run.

113. While there is a considerable amount of deposition testimony taken during the 1970s from Mr. Smith, and in 1979 from Mr. Wenger (who admitted it would be advantageous to his company if the patent in suit were declared invalid) (F–471, p. 40), that the product exhibited qualities of the product produced by the Flier process, there is credible testimony from a disinterested third party, Gus Mustakas, directly to the contrary (F–346, p. 24, lines 18–22, p. 37, lines 20–23, p. 38, lines 1–23, p. 39, lines 1–11).

114. Mr. Mustakas, a Department of Agriculture employee who was present at the December, 1961, run conducted by Oak Smith, testified, "Nor were we alert to any physical changes" (F–346, p. 16, lines 3–12). The court notes that the Department of Agriculture had initially resisted the deposing of Mr. Mustakas during the Peoria litigation, although he had been scheduled to appear at the aborted 1972 trial. His testimony sheds light on the alleged prior use and reduction to practice of Oak Smith.

115. A comparison of the depositions of Oak Smith in 1970 (F–1), 1971–72 (F–179, F–196, F–212) and 1979 (F–363, F–389) indicates a definite propensity to testify to further, at times crucial, details in later depositions, contrary to normal memory patterns. This may be illustrated by a comparison of Smith's testimony in 1970, where we are made aware of some product adhesion and expansion (F–1, pp. 44, 52), and his testimony in 1979, where he flatly stated "[i]t had a meat-like texture" (F–363, p. 173). More credence is therefore given to Mr. Smith's earliest deposition, from which the court concludes that no recognition was made of any special results.

116. Attempts by defendant to fill in the missing pieces regarding the product's characteristics have not persuaded the court that Smith performed the patented process and obtained a textured, meat-like product in December of 1961. In this regard, the experimental runs conducted by Dr. Judson Harper in 1981 at defendant's facility in Hutchinson, Kansas, and his testimony relative to the inherent fibrous structure of an expanded continuous rope extrudate, are unavailing. The court was unable to uncover a single instance in the testimony or exhibits where the extrudate from the December, 1961 run was described as a continuous rope. This is not surprising since we know that during that run a knife assembly was attached to the extruder to cut the material as it emerged from the die into 1 ½ inch segments (F–363, p. 119; F–3).

117. Moreover, the record discloses certain information about the defatted run which does not support the contention that Mr. Smith practiced the Flier process and obtained a textured product. From chemical analysis later performed by the U.S.D.A. on product samples, it appears that the defatted soy run was made with an unusually high fat content present (F–353; F–346, pp. 44, 78–79). Regardless of whether the fat was in the starting material, or whether it was present by virtue of the preceding run on full-fat soy, its presence would raise considerable doubt as to whether a textured product was obtained under the circumstances (Tr.Tr. pp. 207, 1788–89).

118. It is clear, in any event, that regardless of the characteristics of the product obtained by Smith in 1961, nothing was done with it, no appreciation of any unusual result was shown by any of the parties present, it was not attempted again until March, 1964 (F–212, p. 379), it was not publicized or made the subject of a patent application even though the "full-fat" extrusion run made on the same day was later patented (F–180, F–396) and publicized (F–360; F–346, pp. 69–71). Wenger routinely patented its extrusion developments (F–395—F–401). In contrast, it appears that this isolated run with defatted material was resurrected only when the importance of Flier's invention became known in the industry. Promotion of Wenger extruder's for this process was not instituted until much later. There was no benefit to the public from Smith's run. Even assuming, therefore, that the Smith product exhibited the characteristics of one produced by the Flier process, the experiment was abandoned, suppressed or concealed.

119. As to whether the December, 1961, run constitutes a prior use under 35 U.S.C. § 102(a), the above findings are also relevant. While abandonment will not render a successful prior use nonanticipatory, it is indicative of whether there was in fact a successful or complete prior used. Moreover, the position of the defendant that Oak Smith's work in December, 1961, was

in "public use" is inconsistent with the understanding of the United States Department of Agriculture representative to this cooperative effort (F–346, pp. 45–47), inconsistent with contemperaneous correspondence (F–16), and inconsistent with the sworn oath executed June 1, 1965 by the LaVon Wenger (F–477, p. 28) in a patent application on the full-fat soy extrusion work (F–477, pp. 56–58).

### Merl Williams-Central Soya

120. Central Soya Company is a manufacturer of an extruded textured vegetable protein food product known as "Centex" (F–460, pp. 127–28). "Centex" is promoted by Central Soya Company as a meat extender, using a depiction of Dr. Altschul and a quotation of his statement, "The ability to produce texture out of soy flour will probably rank with the invention of bread as one of the truly great inventions of food" (F–465).

121. In February, 1977, Central Soya, through its attorneys, took the sworn statement (F–454A) of Merl Williams, its former employee, with accompanying exhibits (F–454A–WX1 through WX40) in anticipation of litigation with plaintiff (F–454A, p. 21, lines 3–10). The court has reviewed this sworn statement as well as the subsequently taken deposition testimony offered by the defendant.

122. In 1960, Merl Williams of Central Soya Company performed some experimental work on soy materials using Sprout-Waldron equipment. This equipment was composed of a pressure cooker and a connected extruder. This is different from a Wenger extruder which is a friction-extruder (F–454A, p. 21, lines 18–25, p. 22, lines 1–8, p. 23, lines 4–14).

123. In 1960, any successful experimental work by Merl Williams was totally without independent corroboration. There is no evidence of anyone having witnessed whatever process work Williams may have performed or having seen any unusual results.

124. To the contrary, a relatively contemporaneous report dated September 30, 1960, prepared by Talmage Campbell of Central Soya states, "There are no significant [chemical or physical] changes in the soybean products treated" (F–490, p. 2). Since the Flier process produces marked physical changes in characteristics of the starting material to a fibrous, meat-like product, it is extremely doubtful that Williams either practiced the Flier process or obtained the Flier product.

125. It is clear from an examination of the evidence that whatever Williams did obtain as a product it was the result of an accident and was unappreciated. The project was considered a "deadend" (F–454A, p. 76, lines 3–25, p. 77, lines 1–9). The equipment was taken over to make dog food and work on soy was forgone. Neither the product nor the process were commercialized or in any way publicized or made the subject of an application for patent. Williams/Central Soya did at that time seek patent rights for a ring-shaped dog food (F–454A, p. 74, line 25, p. 75, lines 1–25, p. 76, lines 1–2). Moreover, whatever work which had been done on soy materials was considered to have been "confidential," not public (F–423, p. 213; F–460, pp. 137–38; F–478, pp. 59–61). It appears that this soy work was resurrected only many years later when the importance of Flier's invention became apparent to the industry. There was no benefit to the public from Williams' 1960 work. Even assuming, therefore, that the product was obtained or the process practiced, it was abandoned, suppressed or concealed.

126. When Merl Williams dropped the soy extrusion product, and even up to the date of his sworn statement in February, 1977, he admittedly had "no idea" of any special "character" possessed by his soybean meal extruded by itself as compared to extrusion of dog food containing a small percent of meal (F–454A, p. 83, lines 14–19, p. 84, lines 3–10, 25, p. 85, lines 1–20, p. 86, lines 21–25, p. 87, lines 1–16). This strongly indicates to the court that he did not practice the Flier process.

127. A simple contrast of the reactions of Flier when he first practiced his patent-

ed process in January-February, 1963, or Atkinson when he first practiced the process in December, 1963, with the non-existent reaction of either the Central Soya people or the Wenger people when they allegedly practiced the process unusually proves the negative—that neither Central Soya nor Wenger practiced the process or obtained a textured, meat-like product as alleged.

### Sheldon Baer—V.D. Anderson

128. The experiment conducted by Sheldon Baer of V.D. Anderson Co. (F-1130–Swift Dep.Exh. 64R) on February 16, 1960, was totally lacking in independent corroboration as to conditions, results and even its occurrence. The run was recorded at a temperature of 200°F. (F-1128, p. 78, lines 13–16, 23–25, p. 79, lines 4–5; F-1130), well below the temperature of 212°F. required by the Flier patent claims (R200).

129. As to the resulting material from this test, Mr. Baer described it some 12 years later as containing some voids and having "toughness," and further testified that at the time he did not relate it to any other type of food product with which he was familiar (F-1128, p. 84, lines 8–25, p. 85, lines 1–8). In addition to these recollections, it is significant that no contemporaneous document or other evidence reflects any fibrous, meat-like, textured product resulting from the experiment. The court concludes that Mr. Baer did not obtain a material which was fibrous and meat-like, or if he did obtain such a material, he did not recognize or appreciate it.

130. Moreover, the testimony of Mr. Baer is actually inconsistent as to possible extrusion of defatted soybean meal and the results obtained (F-1128, p. 80, lines 23–25, p. 81, lines 1–25, p. 82, lines 1–6). While the run in question was conducted as part of an experiment to process extruded soybean meal and corn meal, apparently other extrusion experiments involving only defatted soybean meal were unsuccessful in achieving the desired results (F-1128, p. 82). Data sheets were, accordingly, not retained on these runs, and Mr. Baer was unable to even recall certain important processing conditions employed, such as temperature ranges (F-1128, p. 88). While he subsequently recalled the internal structure of this material as appearing "somewhat fibrous," there is virtually no support in his records for this characterization offered more than a decade later.

131. Again, the court remains unpersuaded by the defendant's attempt to fill in the details by reference to Dr. Harper's testimony regarding inherent fibrous structure in an expanded continuous rope extrudate. Nowhere does Mr. Baer testify that the material was in the form of an expanded continuous rope. While there is no testimony relative to whether or not a knife assembly was used on the run in question, the court notes testimony regarding other extrusion runs on soybean meal where the product as ultimately tested was usually in the form of "little pieces ... a couple, three inches long...." (F-1128, p. 33, lines 16–18). Given a lack of foundation for applying Dr. Harper's tests and conclusions, the court will not speculate as to the meaning of Baer's hindsight reference to a "rope-like material" (F-1128, p. 84, line 12). Furthermore, defendant's attempt to fill in details as to certain processing parameters employed in the run in question by resort to language in the patent on the extruder apparatus utilized is without merit.

132. There is no record of this extruder manufacturer, V.D. Anderson Co./Sheldon Baer, having published or realized any invention of a fibrous meat-like product or a process to obtain such a product. Such realization and publication would have served to sell its extruders.

133. A subsequent sales publication, Bulletin 111.025, by Baer, et al (R218), prepared on or after December, 1965 (F-1128, p. 47), attributed expansion of "cereal grains and oil seeds only insofar as they contain starch, for it is a well-known fact that cereal grains expand very well and oil seeds expand very little or not at all" (R218, p. 4, para. 2). While it is questionable to what extent Baer ever expanded soybean meal prior to about 1963, it is

significant that the publication makes no mention of anyone having formed an expanded product with fibrous, meat-like properties. This publication (R218) was cited to the patent examiner during prosecution of Flier's CIP application (R256).

134. At best, the uncorroborated test work of Baer/V.D. Anderson Co in 1960 was an abandoned experiment, not resulting in a fibrous, meat-like product. Certainly Mr. Baer did not appreciate any special results and did not thereafter pursue the matter. It does not constitute a basis for invalidating the claims in issue under either 35 U.S.C. § 102(a) or (g), or for that matter under § 102(b) as also alleged by defendant.

## B. *Alleged Statutory Bars*

### i) *Descriptive Support in the Parent Application*

135. Defendant also asserts, as anticipatory references under 35 U.S.C. § 102(b), the publication on November 22, 1965 of Dutch Patent Application No. 6506477 (F–1300), sales by Swift and ADM of products allegedly made according to the patented process, and Swift's alleged public use of the process in conjunction with Wenger Manufacturing Co. in March, 1964. In addition, defendant has referred the court to testing of an experimental dog food by Ralston between 1963 and 1965. Since these events occurred either after the filing of Flier's parent application on July 10, 1964, or within one year prior to that date, but more than one year prior to the December 9, 1966 filing date of the CIP application, whether they are available references depends upon the effective filing date to which the patent claims are entitled. Defendant contends that all 52 of the claims are not entitled to the 1964 filing date because certain limitations in each claim are not described in the parent application within the meaning of 35 U.S.C. § 112. Plaintiff responds that the 1964 application contains both literal and, as to certain claim limitations, inherent descriptive support for claims 1–33.

136. As to claims 34–52, plaintiff's position is apparently that the parent application contains descriptive support for some, though not necessarily all of the claim limitations (Tr.Tr. pp. 2143–44; F–1202, Interrogatory No. 106(a)). Otherwise, plaintiff does not attempt to show that claims 34–52 find full descriptive support in the parent application. (*See, e.g.,* Tr.Tr. p. 419).

137. With regard to claims 1–33, defendant isolates four categories of claim limitations as lacking descriptive support in the parent application: Protein content, total and added moisture content limitations, temperature limitations, and the location of occurrence of fiber formation. Defendant does not contend that the 1964 application does not enable one skilled in the art to practice the invention as claimed, but rather restricts analysis under 35 U.S.C. § 112 to the description of the invention requirement. In fact, it is noted that there is evidence confirming that the parent disclosure is enabling. *See* F–793, pp. 3–16.

### a.) *Protein Content*

138. The claim limitations which defendant asserts do not find descriptive support involve the utilization, as starting material of "vegetable material ... having a protein content of at least about that of solvent-extracted soybean meal" (claims 1–7, 10–17, 32); of "a soybean meal having a protein content of at least about 50% " (claims 8 and 9); and of "solvent-extracted soybean material having a protein content at least about that of solvent-extracted soybean meal" (claims 18–26). Though defendant does not contend lack of descriptive support for that portion of the claimed language calling for use of a "protein-containing vegetable material," "proteinaceous vegetable" or "solvent-extracted soybean material" (Tr.Tr. pp. 2058–64), it is argued that the parent application does not contain descriptive support for the above protein content claim limitations since each sets forth an open-ended range of from about 50% to 100% protein. The open-ended range is in part predicated on the assumption that solvent-extracted soybean meal contains about 50% protein (Tr.Tr. p. 1873).

139. Defendant, in effect, argues that there is descriptive support for the claims insofar as they envision the utilization of soybean meal. However, defendant goes further and places a 50% limit on the protein content of the meal (Tr.Tr. p. 2066). The court agrees that the parent application discloses the treatment of soybean meal to obtain the desired product. The court disagrees that the parent disclosure is restricted to soybean meal with a maximum of 50% protein. This conclusion is based both on the 1964 disclosure and on consideration of knowledge possessed by those skilled in the art of extrusion of both farinaceous and proteinaceous vegetable materials in 1964. The parent generally discloses obtaining the desired products through treatment of soybean meal having a "high protein content" (R 255, p. 3). While the preferred level is identified at approximately 50% protein, frequent reference is made to the starting material as 50% soybean meal obtained by solvent-extraction (R 255, p. 3, line 17; p. 4 line 2; p. 5, line 1). In fact, at one point in Example 1, Flier called for use of 50% soybean meal contained a protein content of 50% (R 255, p. 5). The apparent reason for specifying the actual level of protein along with the designation of 50% soybean meal was that the protein content of such meal in fact varied. According to the Soybean Blue Book for 1964 (F–1288) and the Yearbook and Trading Rules for 1964–1965 (F–1542), both references reflecting knowledge of those skilled in the art, the protein content of commodity of 50% solvent-extracted soybean meal was "minimum 50.0%" (F–1288, p. 20; F–1542, p. 22). It is doubtful that a person skilled in the art would therefore have construed from the parents disclosure a maximum protein limit of about 50%.

140. In addition, the above-mentioned references also indicate that a lower protein, defatted soybean meal, "44% soybean meal," was a standard available commodity. This meal had a minimum of 44% protein. The specification disclosed, in Example 2, that soybean meal with a protein content less than 50% could be treated to increase the protein content to the preferred level. This was accomplished by addition of a high protein componet (R 255, p. 6). The court does not believe that adjustment of the protein content of soybean meal would have been recognized by those skilled in the art as limited to obtaining the preferred 50% protein level. Soy protein concentrate and soy protein isolate were well known in the art on July 10, 1964. *See* R 258 (29), (33), (45), (46), (47), (48), (50), (60), (64) and 123(b). Adjustment of the protein content of soybean meal to a level above 50% is reasonably conveyed where the disclosure set forth a requirement of a "high protein content," disclosed the preferred level but no upper limit, and indicated that the protein content of the soybean meal could be further adjusted. Defendant has not persuaded the court that the parent application does not satisfy the description requirement of § 112 as to the disputed protein content claim limitations that the starting material have a protein content "at least about that of solvent extracted soybean meal" or "of at least about 50%."

### b.) *Total and Added Moisture*

141. Claim limitations which defendant asserts lack descriptive support in the parent application call for moistening the starting material to a moisture content "at least about 20% by weight" (claims 1–9), adjusting the moisture content to a content "at least about 25% by weight" (claims 10–13), or adjusting the moisture content to "between about 20% and about 40% by weight" (claims 14, 29–31, 33). In addition, certain claims recite the amount of added moisture as "at least 25% by weight" (claims 15–17, 32), and "in the range of 20–30% of the resulting mixture" (claims 27 and 28). Claims simply calling for "sufficient water to permit the resulting mixture to be passed through an extruder" (claims 18, 19, 21–26), or added water of "approximately 25% of the mixture" (claim 20) are not challenged. As to the above total or added moisture range limitations in controversy, defendant argues they are unsupported by the parent application's general disclosure of mixing water with soybean

meal and specifically, in Examples 1 and 2, of adding water of approximately 25% and 27% of the total mixture (R 255, pp. 5 and 6).

142. An important function of the moisture component is to permit the starting material mix to be conveyed through the extruder and be subjected to sufficient heat, pressure and mechanical working. Plaintiff offered evidence of a customary, quick, non-scientific method of those skilled in the art of extruding various vegetable materials to determine effective moisture content. This was the hand-squeeze or ball test (Tr.Tr. pp. 193–94; F–492, pp. 39–40; R 202J, pp. 18–19, 25–29; R 202K, pp. 129–31, 192–93). A handful of the starting material would stick together in a loosely compacted ball if the moisture was somewhere close to the preferred range of about 25% (Tr.Tr. p. 194; R 202J, pp. 28–29). Defendant's expert, Dr. Harper, acknowledged that this squeeze test had been commonly used by the trade for many years (Tr.Tr. p. 1639). There is also testimony relating this test, in a general way, to the limits of the approximate 20%–40% moisture range. Material with approximately 20% and below moisture is dry and susceptible to burning. Instead of sticking together when squeezed, it tends to fall apart (Tr.Tr. p. 194; R 202K, p. 131; F–492, p. 40). As the material becomes wetter, it progresses through the stage of cohesion to the point where it becomes semi-fluid (R 202J, pp. 28–29; R 202K, p. 131; F–492, p. 40). Moisture content approaching 50% and above results in a starting material which simply squeezes out through one's fingers (R 202K, p. 131).

143. Douglas Hale, Flier's supervisor and one skilled in the art at the time of the invention, agreed that since 1954 it had been the practice at Ralston Purina, when extruding mixtures of grains and soy flours in the production of various commercial products, to use a moisture content of between 20% and 40% (F–314, 30–31). He also indicated that he normally found that at 40% moisture there was too little friction in the extruder to develop the necessary pressure (R 202K, p. 131). Dr. Harper acknowledged that, historically, typical extrusion operating parameters involved the moisture content range from about 12% to 40% (Tr.Tr. p. 1387). Plaintiff also offered various prior art patents and publications, involving the subject of puffing grain materials and mechanically working soybean material, which contained examples of moisture ranges overlapping much of the approximate 20%–40% range recited in the Flier patent. See e.g. R 285(4), pp. 3–7; R 258(8), pp. 4–6; R 258(71), column 7, lines 22–28; R 258(119), p. 3.

144. To this general knowledge of moisture parameters of extrusion processing various vegetable materials, the parent application provides two specific examples involving extrusion of 50% soybean meal. These two examples disclose the addition of roughly 25% and 27% moisture. From these percentages, approximate ranges of total moisture content can be calculated by taking into consideration the moisture content of the soybean meal itself. For example, in 1964 it was known to those skilled in the art that the maximum moisture content of soybean meal was 12% (F–1285, p. 63; F–1286, p. 66; F–1287, p. 61; F–1288, p. 19). Taking into account general knowledge that commodity soybean meal varied as to moisture content, various calculations were offered at trial of total moisture content ranges. Defendant's estimates, using a 12% figure, extended to a maximum of approximately 36% (Tr.Tr. 2166; F–1579). Plaintiff arrived at a similar maximum amount, however using a 10% moisture figure for the soybean meal (Tr.Tr. 10–12). Considering the parent examples in the context of a potential variation of moisture in the soybean meal, one could deduce a fairly broad range of both total and added moisture content with an upper limit of about 40%. Viewing such ranges in the context of evidence offered by plaintiff regarding knowledge of those skilled in the art of extrusion cooking and processing of vegetable materials as to the function of the moisture component and the squeeze test, the court believes the parent contains adequate descriptive support for the

claimed limitation that the starting material have "an added moisture content of at least 25%" as provided in claims 15–17 and 32.

145. Furthermore, in view of the common knowledge of a preferable moisture range represented by the so-called squeeze test and the fact the soybean meal contains some moisture, the court is not persuaded that a skilled artisan would have recognized in the parent disclosure a restriction of adding a minimum of 25% moisture. It is noted that a number of prior patents involving extrusion of vegetable materials teach a desirable moisture content range roughly equivalent to the loosely compacted ball of starting material. *See e.g.* R 258(65), column 2, lines 16–19; R 258(75), column 3, lines 40–45. It is concluded that a skilled artisan would have reasonably been led by Flier's 1964 disclosure to the limitations of claims 10–14 calling for adjusting the moisture to a content of "at least about 25%," and to claims 19, 27 and 28 reciting adding water "in the range of 20% to 30%."

146. The court has somewhat greater difficulty with claims which recite total moisture content as low as approximately 20%. The squeeze test alone is not sufficiently definite to establish this as an inherent, albeit approximate, lower limit, and when one considers both the prior patents and publications cited by plaintiff as well as the testimony of Dr. Harper, it does not appear to have been unusual to extrude certain vegetable materials at total moisture contents below 20%. In view of the disclosure in the CIP application that the temperature should increase as the moisture content decreases (R 256, p. 13), the practical minimum moisture limit as claimed assumes greater importance. The court is persuaded that this was not conveyed to one skilled in the art by the patent's disclosure, even taking into consideration the knowledge such a skilled artisan would have concerning the functions of the moisture component. The court therefore finds inadequate descriptive support in the parent application for the moisture limitations of claims 1–9 calling for a total mois-

ture content of "at least about 20%," as well as claims 14, 29–31 & 33 calling for a total moisture content between about 20% and about 40%.

### c.) *Temperature*

147. Here, the contested claim limitations recite extrusion at temperatures "in excess of 212°F" (claims 1–7, 10); "at least about 212°F" (claims 8 and 9); "substantially above 212°F" (claims 11–13, 15–16, 28–33); "substantially in excess of 212°F" (claim 14); and "into the range of 212°–310°F" (claim 27). Defendant contends that all limitations but that of claim 27, which allegedly also lacks descriptive support, are open-ended and literally read upon infinity.

148. Again, the court is persuaded that viewed from the perspective of one skilled in the art, there is adequate descriptive support in the parent application for these claimed limitations. The parent states, "in general the invention comprises heating and applying pressure to a mixture..." (R 255, p. 2, line 1). The mixture "must be subjected to heat, pressure and mechanical agitation for a period of time during the extrusion process." (R 255, p. 3, lines 24–26). In addition, Example 1 specifically sets for an exemplary temperature range of 212°–380°F.

149. Experts from both parties were in substantial agreement that the parent application sets forth the critical lower limit of temperature and supports this limit in the patent claims (Tr.Tr. 2084–85, 2372–73). The critical nature of this lower limit lies in the fact the extrudate must be above the boiling point of water in order to expand (Tr.Tr. 396–400).

150. As a practical matter, however, one skilled in the general art of extrusion would not consider the concept of infinity in observing an upper temperature limit. Moreover, the evidence does not indicate that the temperature value of 380°F in Example 1 is linked to a critical value, such as the boiling point of water, which would be recognized by one skilled in the art as an upper limit (Tr.Tr. pp. 2371–73). The

skilled artisan's appreciation of the "heating" factor would, "the court believes" be linked to his understanding of extrusion processing and to the information conveyed by the entirety of the parent disclosure.

151. Heating in the context of the Flier patent is primarily a result of the mechanical working of the material by the extruder screw and the shear force against the barrel and other restrictions. (Tr.Tr. pp. 647–48). It is interrelated with pressure, also a result of mechanical working and shear force (Tr.Tr. p. 653). The parent application states: "Due to the blocking action of plate 7 and the rotation of screw 5, the mixture is subjected to substantial pressures and is heated" (R 255, p. 4, lines 8–11). Given that a substantial increase in pressure would also result in a substantial increase in temperature, even defendant's expert, Mr. Davis, agrees that the temperature "being increased substantially" found support in the parent application (Tr.Tr. 2087). Aside from his recognition of a critical lower limit of 212°F, the skilled artisan would observe a practical upper limit of avoiding burning or scorching material passing through the extruder (F–1128, p. 87).

152. It is also instructive to note the testimony of defendant's technical expert, Mr. Harper, that typical extruders for soy and grain materials operate at maximum temperatures in the neighborhood of 300°–350°F, or within the temperatures specifically set forth in example 1 of the parent application (Tr.Tr. 1379–85). Even if we accepted the 380°F figure in the parent example as an upper limit, the evidence indicates that "substantially above 212°F," for instance, does not read on embodiments outside this example. The court finds that all similar temperature recitations of the claims in issue are fully supported by the parent application. Furthermore, as to claim 27, there is no evidence that the range 212°–310°F pertains to a different invention and involves anything more than claiming a portion of that which had been earlier described and adequately conveyed to persons skilled in the art.

### d.) *Fibrous Structure*

153. This contested category of claim limitations involves claims which require, in nearly identical language, that the material be subjected to sufficient heat, pressure and mechanical working so that "upon release of the pressure, [it] is capable of becoming a fibrous structure" (claims 1–9, 14–33). Claims 10–13, to the same effect though stated somewhat differently, require that the material be advanced through the elongated zone of confinement "for a period of time sufficient to cause the material to have a fibrous nature as it is finally discharged." It is defendant's position that the terminology requires that all fiber formation take place external to the extruder die, and that the parent application discloses an "antithetical" process where the fiber phenomenon occurs inside the extruder.

154. The parent application at several points indicates that fiber formation may occur within the extruder. However, nothing in the disclosure indicates a requirement that all of the fiber formation take place either internal or external to the extruder. In fact, the disclosure contains language literally supportive of fiber formation external to the extruder die. When our attention is focused on exactly where the fibers form, the parent application can be read to support either theory. This may be illustrated by reference to the two examples in the parent application. Example 1, states: "While in the tube the structure of the mixture changed and it acquired a fibrous meat-like texture... The mixture, when delivered from nozzle 19, had a puffed and fibrous meat-like texture." Example 2 states: "The mixture was then gradually forced through hole 11 into tube 17 and when delivered from nozzle 19 had a puffed and fibrous meat-like texture."

155. The evidence does not indicate that persons skilled in the art of food extrusion were, at the time of Flier's initial disclosure, concerned in any way with the exact situs of fiber formation, other than that a fibrous product appear emerging from the final extruder die. On July 10, 1964, at the

time of the filing of the continuation-in-part in 1966, and up to the present day, those skilled in the art practiced the process by observing the end product in order to determine if the fibrous, meat-like structure has resulted (Tr.Tr. pp. 649–52, 1237–39, 1539–41, 2025–26). Moreover, there is no evidence that the Flier patent was allowed on the basis of the specific situs of the fiber phenomenon (Tr.Tr. pp. 2352–53).

156. To this day, even assuming that the fiber situs question has relevance to the issue of descriptive support, the question remains largely unresolved. Dr. Harper, defendant's technical expert, testified that he concluded within the past two years that most of the fiber formation takes place within the extruder during practice of the process. He was previously on record in technical publications, including his book published in 1981, as stating fiber formation occurred at the end of the screw, in the die orifice, and with expansion on exit of the material from the die. This, however, is admittedly all theory since it is impossible to examine the contents of the extruder when it is operating, and shutting it down to examine the contents necessarily involves release of the pressure and lowering of the temperature (Tr.Tr. pp. 636–37, 1250, 1258–59, 1690–91, 1746, 1796). Even assuming the accuracy of Dr. Harper's more recent theory, however, some fibrous formation does take place at the die in accordance with his own testimony (Tr.Tr. pp. 1730, 1737–41).

157. As indicated earlier (Findings of Fact No. 85), the court rejects defendant's interpretation that the claim limitations relating to fiber structure formation exclude the possibility of formation of fiber inside the extruder. Plaintiff's legal expert, Mr. Zarley, testified that it was not critical to the invention where the fiber formed and that the claimed language here under discussion merely required that the fiber formation take place "at least at the point of discharge" (Tr.Tr. p. 877). The court is in agreement with Mr. Zarley's interpretation of the language. So viewed the language of Example 1 of the Flier Parent Application is consistent with that in the claims at issue and descriptive support exists. The language of Example 2, in any event, provides specific descriptive support for the claimed language here in issue.

e.) *Experimentation in 1966*

158. Aside from defendant's assertion that the parent application lacks literal support for various claimed limitations, and does not contain comparable range limitations as recited in certain claims, defendant focuses on experimental work at Ralston Purina during the summer and fall of 1966. It is to the events surrounding this testing work that defendant reserves much of its evidence in support of the proposition that the parent application contains inadequate descriptive support under § 112 (*See* F–1302, incorporating F–567, F–570, F–573, F–575, F–576, F–577, F–672, F–749. *See also* R 294; R 295; F–569 and F–571). Defendant argues that this evidence proves that all the claim limitations in controversy necessarily derived from this experimental work. However, defendant's expert, Mr. Davis, who acknowledged he was not one skilled in the art, also acknowledged the lack of direct correspondence between the testing data and the specific claim limitations (Tr.Tr. pp. 1957–58, 1964–66, 1978–79). Nevertheless, defendant wishes the court to infer that critical claim limitations were discovered only after knowledge of the co-pending patent application filed by William Atkinson, and after the 1966 test work. On the facts, and as regards disputed claims 1–33, the court declines to make such an inference. It is not clear what was discovered by this testing, other than the optimum conditions for producing the best fiber while utilizing various pretreatments (F–576, p. 2). It is not even clear to what extent this testing related to the Flier patent or to the Jenkins patent (F–1321) which issued from a continuation-in-part application filed the same day the Flier CIP application was filed (*See* Tr.Tr. pp. 1963–71, 1976, 1981–84, 1999–2003, 2225–40).

159. While there was testimony to the effect that the description requirement of § 112 must be met without the need for

experimentation, the court believes that defendant's focus on experimentation, whether conducted by a skilled artisan practicing the invention or by plaintiff in 1966, obscures the real issue. As Mr. Davis agreed, regardless of what experiments were conducted before the CIP application was filed, the ultimate test is whether or not the claims as they appear in the patent are supported by the parent application within the meaning of § 112 (Tr.Tr. pp. 1986–87). Mr. Davis also agreed that what the disclosure meant to one skilled in the art is of critical importance (Tr.Tr. pp. 1975, 2080). The issue, therefore, is whether the disclosure of the parent application reasonably conveyed to one skilled in the art that Flier was then in possession of the later claimed subject matter. The claimed limitations may not all be so disclosed, and therefore some claims may be entitled only to the benefit of the CIP application filing date. The court finds that to be the case here.

160. Claims 10–13, 15–28 and 32 find descriptive support in the Flier patent application. Claims 1–9, 14, 29–31, and 33–52 are entitled to the effective filing date of the 1966 CIP application.

### ii) *ADM Dutch Publication*

161. Certain claim elements are described, for purposes of anticipation, in the Dutch Publication (*i.e.* moisture content [F–1300, pp. 4 and 6]; temperature range [F–1300, pp. 4–6]; elevated pressures [F–1300, p. 5]; controlling or maintaining the pH [F–1300, pp. 5 & 7], or use of an edible electrolyte and/or use of sodium hydroxide [F–1300, p. 7] and allowing the mix to set or cure [F–1300, pp. 6 and 7]; and severing or forming the extruded product into chunks [F–1300, p. 6]). However, the court agrees with plaintiff's position that there are serious deficiencies as to certain claim features.

162. Notably, the publication fails to disclose the importance of having a minor amount of fat present during extrusion. While the publication references solvent extraction of oilseeds, and more particularly extracted soy flakes, it likewise states that "[a]ny type of edible protein of vegetable, animal or marine origin may be used." F–1300, p. 3.

163. Defendant seeks to supplement the publication by reference to contemporary Year Book and Trading Rules, and Soybean Blue Books, which specify the standard fat contents for conditioned flakes or defatted soybean meal anywhere from 0.5 to 2% (*See* F–1285–1290; F–1543–1547). Yet one skilled in the art would not, from the publication and this knowledge, thereby be placed in possession of the critical element of attention to the fat content during extrusion. The publication makes no reference to either the selection of the starting material to insure a low fat content or, as importantly, to appropriate extrusion conditions to insure that otherwise acceptable starting material will not become fat contaminated.

164. The Dutch publication is also defective in its persistent use of the term "plexilamellar" to describe the desired extrudate. Defendant's legal expert, Mr. Davis, agreed that an understanding of this term was critical to being able to understand the publication (Tr.Tr. 2027), though he admitted he had no such understanding (Tr.Tr. 2019). He inferred from the context of the description that it meant textured or fibrous but agreed that these words were nowhere used in conjunction with this term (Tr.Tr. p. 2017). The evidence indicates that others have pondered over the meaning of this term as well. During his deposition in 1977, Dr. Floyd Shoup, then defendant's Director of Research and Quality Control, stated that despite analysis he did not understand the meaning of the term. Shoup deposition, May 18, 1977, pp. 59–60. Even the person who was responsible for use of the word in the Dutch publication, Mr. Atkinson, was later to confess a lack of understanding. During the interference proceedings, he responded to a question whether he would use the term to describe a particular material by stating, "I don't know, because I don't know a good definition of the word plexilamellar." R202F, p. 238.

165. Reliance on this term to describe the extrudate, and thereby to inform an attempting practitioner what to strive for, makes this publication not clear but rather ambiguous.

166. Finally, the publication does not disclose the desirability of separate zones of confinement or orifices as required by claims 1, 2, 14, 30, 31, 35, 39, 48 and 49. Defendant attempts to supplement the publication by deposition testimony that a "prodex" extruder referenced in the publication was equipped during the period 1964–1966 with breaker plates (F–866; F–882). However, the court believes this to be insufficient to establish that the publication thereby disclosed this claim requirement. Whether this element is met depends on the particular extruder or extruder apparatus utilized and the publication does not disclose this within its four corners.

### iii) *Alleged Sales, Offers for Sale and Public Use*

167. As to ADM's alleged offer for sale, defendant's evidence consists primarily of a letter of June 25, 1965 from ADM to Swift (F–836). Defendant alleges that an offer for sale was made of a textured vegetable protein product made in accordance with Flier's claimed operational parameters. Yet no additional evidence was offered that the sample enclosed with the letter was made by a process correlating with the Flier patented process. There is no testimony, or other evidence, as to the process steps and conditions employed. Without more direct evidence the court will not speculate that this sample, and the products referenced in the letter, were made in accordance with the patented process.

168. Defendant asks the court to engage in even greater speculation as to the alleged sales and offers for sale by Swift in 1963 and 1965. We do not know the process used to make what was apparently a test sample of an "expanded soy product" sent to Campbell Soup Company in 1963 for evaluation (F–815). We do know that this sample was made before Swift even had an extruder. F–947, p. 236.

169. Defendant's principal evidence concerning sales by Swift in 1965 is a copy of a handwritten set of notes allegedly recording shipment of samples of products made in conformity with the Flier process.

170. The document is unsigned and we don't know who made it. There is no other evidence corroborating that such samples were made or sent, or for what purpose they may have been made or sent. Nor is there direct evidence of the process employed, assuming the samples were made. The evidence is clearly insufficient on which to predicate an on sale bar.

171. Defendant also asserts a prior public use of the process by Swift in March, 1964, in conjunction with Wenger Manufacturing (F–819, F–820). However, the court is not persuaded that this joint testing endeavor constituted a public use within the meaning of § 102(b). The contention that information from this test was available or accessible to the public is contrary to evidence regarding Wenger's normal business practices and company policy (*See* TDT 421–22).

172. The court has also reviewed evidence pertaining to test data acquired by plaintiff relative to dog acceptance of an experimental dog food (*See* F–896; F–897–F–905; –F–907; F–909–F–911; F–914). The court is unable to conclude that this was a commercial, public use of the patented product and process.

### C. *Unobviousness*

173. The "pertinent art" in this case is that of texturizing vegetable protein. The prior art consists primarily of the Boyer spinning technology, Atkinson's extruder work with protein isolate and, arguably, the extrusion expansion of farinaceous as opposed to proteinaceous materials.

174. The Flier process and products stand out from this prior art. They are different not just in degree but in kind. The process provides an economical and efficient method for converting relatively

low-cost proteinaceous materials into meat-like materials. It nearly duplicates the product of the Boyer spinning process but at a fraction of the cost (Tr.Tr. pp. 1775–85).

175. Those of ordinary skill in the art in 1963 were men such as Oak Smith of Wenger, Merl Williams of Central Soya, Douglas Hale of Ralston Purina, Sheldon Baer of V.D. Anderson, and Robert Boyer. Smith, Williams and Baer attempted to run low-fat soy on an extruder and failed to achieve or appreciate the Flier process and the product obtained by this process. It is apparent from many of these experiments that expansion of vegetable materials to achieve a structure cellular in appearance was a desired result, leading, for instance, Mr. Baer to publicly announce to the trade that expansion occurs in cereal grains and oil seeds only insofar as they contain starch (R 218, p. 4 ¶ 2). Dr. Harper noted correctly that oil seeds contain no starch (Tr.Tr. p. 1395). Even a man of extraordinary skill such as Mr. Atkinson tried and failed to achieve the patented process and product over a period of several years.

176. The work of Hale in the 1950's, on extrusion of primarily farinaceous materials was disclosed in considerable detail to the PTO (see R255, p. 35 et seq.; R256, pp. 49–50). The process and product were different, resulting in no fibrous, meat-like product, but rather one that resulting in no fibrous, meat-like product, but rather one that turned to mush in water (Tr.Tr. pp. 202–04).

177. The invention of the Flier process and product has been lauded by individuals in government such as Dr. Altschul, formerly special adviser in the U.S.D.A., and by those in the industry, including Far-Mar-Co.

178. Extruders capable of carrying out the patented process have been available since prior to the turn of the century (F–882, p. 16).

179. Hexane extracted soy materials have been available since 1900 (*Blaw-Knox Co. v. Hartsville Oil Mill*, 394 F.2d 877 [4th Cir.1968]), and in plentiful supply in this country since at least the mid-1930s (F–460, p. 12).

180. Extruders have been utilized to puff farinaceous materials, such as corn, wheat and barley, in this country since at least 1949 (F–311, p. 46). While solvent-extracted soybean meal was also extruded during this time, it was only used as one minor ingredient along with farinaceous materials which then considered necessary to obtain the desired degree of expansion (*See e.g.* R 218, p. 4; R 215, col. 5).

181. There was a clear and long-felt need for a low-cost, nutritious meat-like food product acceptable to both people and pets.

182. The Flier process and product have achieved significant commercial success. Ralston, since the invention of the process and product by Flier, has sold in excess of $790,000,000 worth of pet food of which the Flier product constitutes, on the average, approximately fifteen percent (Tr.Tr. pp. 376, 378–79; R 232 pp. 1–2). Pet food incorporating the Flier product was marketed under the brand names Chuck Wagon, Homestyle and Mainstay dog food, and Lovin' Spoonfuls cat food. Though advertising will usually play a role in sales volume, as defendant observes, this does not render commercial success irrelevant where, as here, advertising is premised on the unique concept of the product (Tr.Tr. p. 393) which results from the patented process. Ralston has also sold in excess of $18,000,000 worth of the product for human consumption (R 232, p. 3). While these sales are in part due to the efforts of Dr. Altschul, his promotional efforts were clearly the result of a conviction that this was a significant invention which filled a long-standing need (Tr.Tr. pp. 124, 128–29, 133–36). Far-Mar-Co, since commencing the making of the product in 1970, has sold in excess of $24,000,000 worth of the product, primarily for human consumption (R 242; R 259B, Answers to Interrogatories 135–138). Moreover, an entire food-processing industry directed to producing textured vegetable protein products developed

in the years following Flier's initial discovery.

### D. *Alleged Suppression and Misrepresentation of Prior Art*

183. Defendant contends that at various instances during prosecution of the patent-in-suit false oaths and other misrepresentations were made. Elsewhere in these findings the court has determined certain facts relative to this assertion. While defendant confines its contention of inequitable conduct to the issue of whether this is an "exceptional" case under 35 U.S.C. § 285, and while defendant is not the prevailing party in this lawsuit, the court nevertheless deems it appropriate to make a final observation on this matter.

184. Specifically, defendant contends that certain prior art, particularly the ADM Dutch publication, was suppressed or concealed from the examiner, and that attempts were made to deceive the examiner as to prior art teachings regarding expansion of oilseed protein. However, the file history, and other evidence indicates otherwise.

185. The documents pertaining to the Dutch application which Ralston had in its possession prior to mid-1973 disclosed no date of publication (*see* F–699; F–571). After the publication date was discovered, the reference was brought to the attention of the examiner and properly identified. The court notes that the examiner was not only intimately involved in the prosecution of the Ralston applications, but had also been involved in the prosecution of the Atkinson (F–1292, p. 29; F–1294, p. 181) and Wilding (F–945, p. 33) applications both before and following declaration of the interference. Moreover, Ralston's failure to comply with M.P.E.P. 707.05(b) has been the subject of prior rulings of this court, *see Ralston Purina Co. v. Far-Mar-Co, Inc.*, No. 76–426–C6, slip opinion at 3–5 (D.Kan. April 16, 1981), and is not a basis for finding either inequitable conduct or inferring that the examiner did not consider the publication.

186. As for representations concerning expansion of oilseed material, the file history indicates the consistent, and defensible, position of Flier, expressed for example in his Rule 132 affidavits, that it was recognized in the art that oilseed proteins did not sufficiently expand to produce a useful product. He consistently represented that what he had discovered was that under controlled conditions soybean meal could be expanded to produce a useful, and unique, meat-like food product.

### Conclusions of Law

#### I. *General*

1. This is an action for patent infringement under the patent laws of the United States, Title 35, United States Code. This court has jurisdiction of the parties and of the subject matter of this action by virtue of 28 U.S.C. § 1338. Venue is proper in this District pursuant to 28 U.S.C. § 1400(b).

2. Plaintiff, Ralston Purina Company, is the owner of the entire right, title and interest in and to United States Patent 3,940,495, and is the owner of all rights to recover damages for infringement of said patent.

3. Flier Patent 3,940,495 is valid and enforceable as to all asserted claims in suit, namely, 1, 2, 8–20, 22, 23, 25 and 29–33. Furthermore, defendant has not carried its burden of proving invalidity of the remaining non-asserted claims of the patent-in-suit.

4. In determining both the validity and the infringement of a patent, each claim must be considered independently. Neither the determination of validity nor the infringement of one claim affects the validity or infringement of the others. *Leeds & Catlin Co. v. Victor Talking Machine Co.*, 213 U.S. 301, 319, 29 S.Ct. 495, 501, 53 L.Ed. 805 (1909); *Norfin, Inc. v. International Business Machines Corp.*, 625 F.2d 357, 363 (10th Cir.1980).

#### II. *Presumption of Validity*

5. The starting point in any consideration of patent validity is 35 U.S.C.

§ 282: "A patent shall be presumed valid ... the burden of establishing validity of a patent or any claim thereof shall rest on the party asserting it." *Radio Corp. of America v. Radio Engineering Labs, Inc.,* 293 U.S. 1, 7–8, 55 S.Ct. 928, 930–931, 78 L.Ed. 1453 (1934); *Mumm v. Decker & Sons,* 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937). The statutory presumption of validity permanently places the burden of proving facts necessary to a conclusion of invalidity on the party asserting invalidity. *See Richdel, Inc. v. Sunspool Corp.,* 714 F.2d 1573, 1579 (Fed.Cir.1983); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed.Cir.1983). The presumption has no independent evidentiary value, but rather places the burden of going forward, and the ultimate burden of persuasion, upon the party asserting invalidity. *SSIH Equipment S.A. v. ITC,* 718 F.2d 365, 375 (Fed.Cir.1983); *Solder Removal Co. v. USITC,* 65 CCPA 120, 582 F.2d 628, 632 (1978).

■■■ 6. The presumption is not irrebuttable even where all relevant prior art was clearly before the Patent and Trademark Office. *Chore-time Equipment v. Cumberland Corp.,* 713 F.2d 774, 780 (Fed. Cir.1983). Neither is the presumption weakened or destroyed when more pertinent prior art is introduced at trial than that considered by the examiner, though such evidence can facilitate the validity challenger's carrying of its burden of persuasion. *SSIH Equipment S.A. v. ITC, supra* at 375; *Stratoflex, Inc. v. Aeroquip Corp., supra* at 1534. However, all evidence, whether considered by the examiner or not, must be clear and convincing to prove facts capable of overcoming the presumption. *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1360 (Fed. Cir.1984); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1549 (C.A.Fed.1983). The focus of inquiry, then, is on whether the party asserting invalidity has met its burden of proof.

7. It is relevant to this inquiry, as to deference due the Patent and Trademark Office decision to issue the patent, whether or not the prior art relied on by the party attacking the patent's validity was considered by the examiner. As the Court of Appeals for the Federal Circuit states in *American Hoist and Derrick Co. v. Sowa & Sons, supra* at 1360 (emphasis in the original):

"What the production of new prior art or other invalidating evidence not before the PTO does is to eliminate, or at least reduce, the element of deference due the PTO, thereby partially, if not wholly, *discharging* the attacker's *burden,* but neither shifting nor lightening it or changing the standard of proof. When an attacker simply goes over the same ground travelled by the PTO, part of the burden is to show that the PTO was wrong in its decision to grant the patent. When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to *disagree* with the PTO or with *deferring* to its judgment or with taking its expertise into account. The evidence may, therefore, carry more weight and go further toward sustaining the attacker's unchanging burden."

■■■ 8. The burden is also on the party attacking validity to show that specific prior art relied on was not considered by the PTO. *Richdel, Inc. v. Sunspool Corp., supra,* 714 F.2d at 1579. This burden is not necessarily met by merely showing that the examiner failed to cite certain prior art. *Solder Removal Co. v. ITC, supra,* 582 F.2d at 633 n. 9. The evidence in this case indicates that, with the exception of the Central Soya experiments and certain Ralston experimental test data, prior art on which defendant relies, including the ADM Dutch publication, was brought to the attention of the examiner in such fashion that it can be presumed to have been considered by him. Moreover, this evidence was provided the PTO during the course of protracted, and at times, contested, proceedings. In any event, the court has carefully considered the prior art relied upon in determining whether defendant has carried

its burden of proof, and the presumption of patent validity has here been deemed neither strengthened nor weakened.

9. A determination of priority of invention by the Board of Patent Interferences is, likewise, entitled to a presumption of correctness and regularity, and can only be held erroneous through the presentation of clear and convincing evidence carrying thorough conviction. *Coffman v. Ljungkull*, 205 USPQ 56, 61 (W.D.Okla. 1979). While the judgment of the Board is not conclusive upon the defendant, a stranger to the record, defendant "does not move very far upon the pathway to success by showing that what has been heretofore determined is without conclusive force. A patent regularly issued, and even more obviously a patent issued after a hearing of all the rival claimants, is presumed to be valid until the presumption has been overcome by convincing evidence of error." *Radio Corp. of America v. Radio Engineering Labs, Inc., supra*, 293 U.S. at 7, 55 S.Ct. at 931.

III. *Novelty*

A. *Alleged Prior Invention and Use.*

10. Section 102 provides in part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.

Defendant contends that the process and product here in issue was made in this country by four other persons prior to Flier's successful work in early 1963. The prior work of one of these individuals, William Atkinson of ADM, was examined by the Board of Patent Interferences and has been closely reviewed by this court within the legal framework set forth below. Ap-

plying these principles, the court has also considered in detail whether the activities of the other three alleged prior inventors or users, Oak Smith of Wenger Manufacturing, Sheldon Baer of V.D. Anderson and Merl Williams of Central Soya, satisfy the above statutory subsections.

11. The decision of the Board of Patent Interferences is controlling as to the question of priority in later suits unless the contrary is established by testimony which carries thorough conviction. *See, e.g., Morgan v. Daniels*, 153 U.S. 120, 125, 14 S.Ct. 772, 773, 38 L.Ed. 657 (1893); *BJ Service, Inc. v. Dow Chemical Co*, 131 USPQ 321, 325 (N.D.Okla.1961).

12. Generally, the invention of a process is not completed, or reduced to practice, until it is successfully performed. *Corona Cord Tire Co. v. Dovan Chem. Corp.*, 276 U.S. 358, 383, 48 S.Ct. 380, 387, 72 L.Ed. 610 (1928); *Shurie v. Richmond*, 699 F.2d 1156, 1159 (Fed.Cir.1983); *Reese v. Hurst*, 661 F.2d 1222, 1231 (CCPA 1981); *Hess v. Bland*, 52 CCPA 1641, 347 F.2d 835, 841 (1965). Sporadic, non-equilibrium runs of the alleged process are not a successful performance of the process sufficient for a reduction to practice. *See, e.g., Hess v. Bland, supra*, 347 F.2d at 842.

13. To determine whether there has been a prior reduction to practice, the court should review all pertinent corroborative evidence. *E.g. Mattor v. Coolegem*, 530 F.2d 1391 (CCPA 1976). However, an actual reduction to practice must be independently corroborated in all situations and by evidence other than by the testimony of the alleged inventor or by documents originating from him. *E.g., Reese v. Hurst, supra* at 1225; *Mikus v. Wachtel*, 542 F.2d 1157, 1161–62 (CCPA 1976).

14. Independent corroboration is not only required in order to obtain priority under § 102(g) in an interference, but is also required in order to establish a reduction to practice as prior art in order to invalidate a patent. *In re Reuter*, 651 F.2d 751, 758–59 (CCPA 1981); *Lockheed Aircraft Corp. v. United States*, 213 Ct.Cl.

395, 553 F.2d 69, 75 (1977); *Hercules, Inc. v. Exxon Corp.*, 497 F.Supp. 661, 668 (D.Del.1980); *National Tractor Pullers Ass'n v. Watkins*, 205 USPQ 892, 912 (N.D. Ill.1980).

15. Since corroboration must be independent of the inventor, the inventor's notebooks unsigned by witnesses do not suffice since they are simply documents which he produced. *Reese v. Hurst, supra* at 1233; *Velsicol Chemical Corp. v. Monsanto Co.*, 579 F.2d 1038, 1049 (7th Cir.1978); *Mikus v. Wachtel, supra* at 1162; *Gortatowsky v. Anwar*, 58 CCPA 1266, 442 F.2d 970, 972 (1977). Further, in addition to unsigned notebooks, simply providing a witness who was present at the time of the runs who knew generally the products being used as starting materials and the thrust of the experimentation is insufficient corroboration. *Gortatowsky v. Anwar, supra* 442 F.2d at 972. Even weekly progress reports by inventors to their superiors do not provide independent corroboration because, like notebooks, these are merely self-serving declarations made by the inventors. *Alpert v. Slatin*, 49 CCPA 1343, 305 F.2d 891, 895–96 (1962).

16. Physical samples as well as analytic tests performed thereon do not provide independent corroboration unless an independent party can testify that he observed those actual samples being made by the claimed process. *E.g., Reese v. Hurst, supra* at 1231; *Breen v. Henshaw*, 472 F.2d 1398, 1401 (CCPA 1973).

17. Defendant's tests, including the video tapes and other data compiled therefrom, have little probative value and are entitled to little weight since they were all conducted *ex parte*. *See Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 420–21, 22 S.Ct. 698, 705–06, 46 L.Ed. 968 (1902); *Hutzler Bros. Co. v. Sales Affiliates, Inc.*, 164 F.2d 260, 265–66 (4th Cir.1947); *Hanson v. Alpine Valley Ski Area, Inc.*, 204 USPQ 794, 801 (E.D.Mich. 1977), *aff'd*, 611 F.2d 156 (6th Cir.1979); *Rohm & Haas Co. v. Owens-Corning Fiberglass Corp.*, 196 USPQ 726, 741 (N.D.

Ala.1977); *Univ. of Illinois v. Block Drug Co.*, 133 F.Supp. 580, 587 (E.D.Ill.1955), *aff'd*, 241 F.2d 6 (7th Cir.) *cert. denied*, 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957). Also to be accorded little weight are opinions of defendant's expert, based in part on *ex parte* tests, concerning the ultimate legal issues, such as whether particular prior experiments constituted a reduction to practice. *See In re Rueter, supra*, 651 F.2d at 759; *Jamco, Inc. v. Carlson*, 274 F.2d 338, 340 (10th Cir.1959).

18. In considering testimony of alleged prior inventors or users, the court has taken into account the remoteness in time of events testified to. As the Court of Customs and Patent Appeals observed in *In re Reuter, supra* at 759:

"The ten-year lapse of time, due to the frailty of human memory, detracts from the credibility of the affiant. *See Lockheed Aircraft Corp. v. United States, supra* (five to six years); *Rex Chainbelt Inc. v. Borg-Warner Corp.*, 477 F.2d 481, 177 USPQ 549 (CA 7 1973) (eight years); *Goodrich v. Harmsen*, 58 CCPA 1144, 442 F.2d 377, 169 USPQ 553 (1971) (nine years); *Jones Knitting Corp. v. Morgan*, 361 F.2d 451, 149 USPQ 659 (CA 3 1966) (25 years)."

In considering such testimony, the court has also taken into account demonstrated financial interest in the outcome of the litigation. *See Stevenson v. Int'l Trade Comm'n*, 67 CCPA 109, 612 F.2d 546, 550 (1979).

19. It has long been established law that accidental, unintended and unappreciated production of a product does not constitute an anticipation. In *Tilghman v. Proctor*, 102 U.S. 107 (12 Otto), 26 L.Ed. 279 (1881), the Supreme Court upheld the validity of a patent even though small amounts of a product were produced by an earlier process. The Court stated:

"We do not regard the accidental formation of fat acid ... as of any consequence in this inquiry. What the process was by which it was generated or formed was never fully understood. Those engaged in the art of making candles, or in

any other art in which fat acids are desirable, certainly never derived the least hint from this accidental phenomenon in regard to any practicable process for manufacturing such acids.

The accidental effects produced in [two other processes], are of the same character. They revealed no process for the manufacture of fat acids. If the acids were accidentally and unwittingly produced, whilst the operators were in pursuit of other and different results, without exciting attention and without its even being known what was done or how it had been done, it would be absurd to say that this was an anticipation of Tilghman's discovery."

102 U.S. at 711 (12 Otto). *See also Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 66, 43 S.Ct. 322, 329, 67 L.Ed. 523 (1923).

20. The Court of Customs and Patent Appeals has also held that a prior accidental or unwitting duplication of invention would not constitute a prior art reference for either § 102 or § 103. *See Application of Marshall*, 578 F.2d 301, 304, (CCPA 1978); *Application of Bulina*, 53 CCPA 1275, 362 F.2d 555, 559–60 (1966); *Pittsburg Iron & Steel Foundries Co. v. Seaman-Sleeth Co.*, 160 CCA 605, 248 F. 705, 709 (3d Cir.1917).

■■■ 21. In view of the evidence in this case, defendant's reliance on *General Electric v. Jewel Incandescent Lamp*, 326 U.S. 242, 247–49, 66 S.Ct. 81, 83–4, 90 L.Ed. 43 (1945), is misplaced. As in *Tilghman v. Proctor, supra,* a complete lack of appreciation may be revealing. Here, the patented process does not merely involve cooking defatted soy material in an extruder, as Atkinson's extensive experimentation well illustrates. As to each of the alleged prior inventors, the evidence is not persuasive that they practiced the Flier process as claimed. Even assuming they did, any duplication of the patented invention appears to have been accidental and unintended. Their failure to appreciate any unusual product attributes or properties during these experimental runs simply supports this conclusion.

■■■ 22. A party cannot use later testing to prove an actual reduction to practice *nunc pro tunc* where, as here, at the time of the use of a process to produce a product the manufacturer either does not appreciate the product, does not realize the usefulness of the process or product or is not satisfied that he has successfully completed the process so as to produce a product that performs its alleged function. *See Breen v. Henshaw, supra,* 472 F.2d at 1401; *Langer v. Kaufman,* 59 CCPA 1261, 465 F.2d 915, 919–20 (1972); *Heard v. Burton,* 51 CCPA 1502, 333 F.2d 239, 243–44 (1964).

23. Section 102(g) provides that although the invention may have been made earlier by another, this earlier invention or reduction to practice must not have been abandoned, suppressed or concealed. *See Mason v. Hepburn,* 13 App.D.C. 86 (D.C. Cir.1898). It is in the public benefit to award priority to the person who enhances the public knowledge. *Gayler v. Wilder,* 51 U.S. 477 (10 Howard) 13 L.Ed. 504 (1850).

■■■ 24. Proof of abandonment, suppression or concealment of an invention hinges on the particular facts of each case. *E.g., Engelhardt v. Judd,* 54 CCPA, 369 F.2d 408, 411 (1966). Abandonment is not required to be expressed, but can be inferred from the actions of the prior maker. *See e.g., Brokaw v. Vogel,* 57 CCPA 1296, 429 F.2d 476, 479 (1970); *International Glass Co. v. United States,* 187 Ct.Cl. 376, 408 F.2d 395, 403 (1969); *Dollar Electric Co. v. Syndevco, Inc.,* 205 USPQ 949, 959 (E.D.Mich.1979), *aff'd,* 669 F.2d 1370 (6th Cir.1982); *Hughes Aircraft Co. v. General Instrument Corp., supra,* 275 F.Supp. 961 at 971–72 (D.R.I.1967).

■■■ 25. A person who can independently corroborate an actual reduction to practice must take affirmative steps to make the invention publicly known within a reasonable time or else he will be found to have abandoned, suppressed or concealed

the invention within the meaning of § 102(g). *International Glass Co. v. United States; supra,* 408 F.2d at 403.

■ 26. Spurring is further evidence of abandonment, suppression or concealment. However, spurring is not essential to prove abandonment, suppression or concealment. *Peeler v. Miller,* 535 F.2d 647, 653 (CCPA 1976); *Brokaw v. Vogel, supra* 429 F.2d at 478–80; *Woofter v. Carlson,* 54 CCPA 917, 367 F.2d 436, 443–44, 448 (1966), *cert. denied* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967); *Engelhardt v. Judd, supra* 369 F.2d at 414.

■ 27. Spurring occurs when a first party to reduce to practice halts his activities concerning that reduction to practice but later, upon being informed of a second party's pursuit of patent protection for such a product or process, again commences activities to obtain a patent. Spurring is evidence of abandonment since it evidences the party's intent to allow the product or process to languish and not become part of public knowledge had a second party not taken diligent steps to utilize the product. *See Mason v. Hepburn, supra.*

■ 28. The statutory language, "known and used by others in this country" (35 U.S.C. ¶ 102(a)), means publicly known so as to be available to and of benefit to the public. Official Revisor's Note to Sec. 102, 35 U.S.C.A.; Sec. 102, p. 446; *International Glass Co. v. United States, supra,* 408 F.2d at 402; *Soundscriber Corp. v. United States,* 175 Ct.Cl. 644, 360 F.2d 954, 960 (1966). "Public use" under 35 U.S.C. § 102(b) is antithetical to keeping the information confidential. *See, e.g., Norfin, Inc. v. International Business Machines Corp., supra,* 625 F.2d at 360–63. The right to a patent is not affected by abandoned experiments uncommunicated to the public, particularly where the circumstances indicate that the experimenter did not appreciate the virtues and advantages of the invention. *Hughes Aircraft Co. v. General Instruction Corp., supra,* 275 F.Supp. at 972; *Gillman v. Stern,* 114 F.2d 28, 31 (2d Cir.1940), *cert.*

*denied,* 311 U.S. 718, 61 S.Ct. 441, 85 L.Ed. 468 (1941).

■ 29. For this reason, unpublished knowledge of an inventive entity is not "known or used by others." *Union Carbide Corp. v. Filtrol Corp.,* 170 USPQ 482, 518 (C.D.Cal.1971), *aff'd per curiam,* 179 USPQ 209 (9th Cir.1973). The knowledge required by § 102(a) involves some type of public disclosure and is not satisfied by knowledge of a single person, or a few persons working together. *Nat'l Tractor Pullers Ass'n v. Watkins, supra,* 205 USPQ at 912; *Filterite Corp. v. Tate Engineering, Inc.,* 318 F.Supp. 584, 590 (D.Md.1970), *aff'd per curiam,* 447 F.2d 62 (4th Cir.1971).

■ 30. Inactivity by an alleged reducer to practice is suggestive that the reduction to practice did not actually take place. Such inactivity indicates that what actually transpired was an incomplete experiment which will not provide a bar to patentability under any subsection of § 102. *See e.g., Walkup v. Greig,* 52 CCPA 701, 332 F.2d 800, 806 (1964); *Conner v. Joris,* 44 CCPA 772, 241 F.2d 944, 951 (1957). Such inactivity also operates to remove an actual reduction to practice from consideration under § 102(g), since the passage of twenty-seven months between a reduction to practice and the filing of a patent application amounts to more than "mere delay" and constitutes abandonment, suppression or concealment. *See e.g., Young v. Dworkin,* 489 F.2d 1277, 1281–82 (CCPA 1974); *International Glass Co. v. United States, supra,* 408 F.2d at 401–03; *Englehardt v. Judd, supra,* 369 F.2d at 414.

■ 31. Atkinson neither conceived nor reduced to practice the invention which was the subject of the Flier patent until some ten months following Flier's reduction to practice.

32. Wilding did not conceive the invention which was the subject of the Flier patent prior to Flier's reduction to practice.

33. It is highly unlikely, and defendant did not carry its burden of proving, that

Baer (V.D. Anderson), Williams (Central Soya) or Smith (Wenger) obtained the patented product which is the result of the patented process in their 1960 and 1961 experiments. Moreover, even if we assume they did, such a result was accidental and totally unappreciated. The public gained no benefit whatever from these experiments, and such activities were not otherwise accessible to the public so as to constitute a prior use under either § 102(a) or § 102(b).

34. Furthermore, the evidence indicates that Baer, Williams and Smith abandoned, suppressed or concealed any process run or any product obtained during their experiments prior to the Flier conception and reduction to practice. It appears to the court that the resurrection of the 1960 Central Soya experiments in 1977, the 1961 Wenger experiment in 1969 and the 1960 V.D. Anderson experiment in 1971 was the result of "spurring."

### B. *Alleged Statutory Bars*

35. Under § 102(b), "A person shall be entitled to a patent unless—

"(b) The invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States...."

Defendant contends all of the claims of patent-in-suit contain new matter disclosed for the first time in the CIP Application filed on December 9, 1966. Given this as the earliest effective filing date, defendant further contends that applicable prior art under § 102(b) anticipates each claim of the patent. The initial inquiry is whether defendant has met its burden of proof as to the effective filing date of each of the claims of the patent.

### *Sufficiency of the Disclosure of the Parent Application*

■ 36. Under 35 U.S.C. § 120, an application for patent for an invention disclosed in the manner provided by the first paragraph of 35 U.S.C. § 112 in a previous-

ly filed application is entitled to the effective filing date of the prior application as to such invention. The word "invention," as used in § 120 refers to the claimed invention in a continuing application. *Application of Scheiber,* 587 F.2d 59 (CCPA 1978). In this case, defendant contends that plaintiff is not entitled to the effective filing date of the parent application, arguing that certain subject matter as eventually claimed in the patent in suit is not disclosed in the parent in accordance with § 112. Specifically, defendant argues that the 1964 application does not satisfy the description of the invention requirement of § 112. The first paragraph of this section provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any persons skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

■ 37. The statutory presumption of patent validity also extends to a presumption that the inventor complied with all the requirements of 35 U.S.C. § 112. *Ellipse Corp. v. Ford Motor Co.,* 452 F.2d 163, 170 (7th Cir.1971), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972). *See also Mumm v. Decker & Sons,* 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983 (1937). Moreover, as already indicated, 35 U.S.C. § 282 places the burden of proving facts necessary to a conclusion of invalidity on the party asserting such invalidity. *Richdel, Inc. v. Sunspool Corp., supra,* 714 F.2d at 1579; *Stratoflex, Inc. v. Aeroquip Corp., supra,* 713 F.2d at 1534; *Solder Removal Co. v. ITC, supra,* 582 F.2d at 632–33. This would include the assertion of invalidity premised on prior art allegedly applicable because various claim limitations fail to find descriptive support in a parent application predating the references. The cases on which defendant relies to place upon plaintiff the ultimate burden

of persuasion as to descriptive support in the parent application are here unavailing. These cases include appeals from Patent and Trademark Office determinations where invalidity of a patent was not an issue, *see e.g., Wagoner v. Barger,* 59 CCPA 1213, 463 F.2d 1377 (1972), decisions where the presumption of validity was either deemed to have been weakened or was simply not applied to the question of compliance with 35 U.S.C. § 120 and § 112, *e.g., Kurt H. Volk v. Foundation for Christian Living,* 534 F.Supp. 1059 (S.D.N. Y.1982), and actions where compliance with § 120 to avoid an allegedly anticipating reference was neither addressed nor in issue. *See e.g., Moore v. United States,* 194 U.S. P.Q. 423 (Ct.Cls.1977).

■ 38. The function of the description requirement in § 112 is to ensure that the inventor had possession, as of the filing date of the application relied on, of the specific subject matter later claimed by him. *Application of Edwards,* 568 F.2d 1349, 1351 (CCPA 1978); *Application of Blaser,* 556 F.2d 534, 537 (CCPA 1977); *Application of Wertheim,* 541 F.2d 257, 262 (CCPA 1976); *Application of Smith,* 481 F.2d 910, 914 (CCPA 1973). How the specification accomplishes this is not material. *Application of Wertheim, supra; Application of Smith, supra.*

■ 39. To provide descriptive support, it is not necessary that the earlier application describe the claim limitations exactly, *In re Lukach,* 58 CCPA 1233, 442 F.2d 967 (1971), but only so clearly that persons of ordinary skill in the art will recognize from the disclosure that applicant's invented processes included those limitations. *Application of Herschler,* 591 F.2d 693, 701 (CCPA 1979); *Application of Wertheim, supra* at 262; *Application of Smythe,* 480 F.2d 1376, 1382 (CCPA 1973). Put another way, the disclosure of the application relied upon complies with the written description requirement if it reasonably conveys to the skilled artisan that the inventor had possession, at the time of its filing, of the later claimed subject matter. *In re Kaslow,* 707 F.2d 1366, 1375 (Fed.

Cir.1983); *Application of Edwards, supra* at 1352; *Application of Driscoll,* 562 F.2d 1245, 1248–49 (CCPA 1977). Accordingly, in this case, we must view the sufficiency of the parent's disclosure from the perspective of persons of ordinary skill in the art in 1964, *Application of Smith, supra* at 914, and determine whether the parent application provides adequate direction which reasonably leads skilled artisans to the later claimed process. *Application of Edwards, supra,* at 1352.

■ 40. In determining compliance with the written description requirement, each case must be decided on its own specific facts, *Application of Driscoll, supra* at 1248–50, taking into account the nature of the invention and the amount of knowledge imparted by the disclosure to those skilled in the art. *Application of Wertheim, supra* at 262–63.

■ 41. When making this determination, a mere comparison of ranges is not enough. *Application of Wertheim, supra* at 263. Nor is it sufficient to prove lack of descriptive support by merely pointing out an absence of literal support in an earlier application. *Application of Voss,* 557 F.2d 812, 817 (CCPA 1977); *Application of Wertheim, supra* at 265.

■ 42. The disclosure in question should be read in light of the knowledge possessed by persons skilled in the art. *See In re Lange,* 644 F.2d 856, 863 (CCPA 1981); *Application of Eickmeyer,* 602 F.2d 974, (CCPA 1979); *Application of Smythe, supra,* 480 F.2d at 1384; *In re Lukach, supra,* 442 F.2d at 969. Material which is known to those skilled in the art, including prior art publications and patents, need not be disclosed in the parent since it is as if such knowledge were written out in the specification. *Webster Loom Co. v. Higgins,* 105 U.S. 580, 585–86 (15 Otto) 26 L.Ed. 1177 (1882). As the Court observed in *Webster Loom,* the applicant "may begin at the point where his invention begins, and describe what he has made that is new, and what it replaces of the old. That which is common and well known is as if it were

written out in the patent and delineated in the drawings." *Id.* at 586, 15 (Otto). For example, in determining the amount of support that is required for a limitation contained within the later filed application, the more predictable that element of the invention is, the less support may be required to convey that information to one skilled in the art. *Application of Smythe, supra* at 1383. Also, patent claims need not be restricted to a preferred range specifically when one skilled in the art would recognize a broader disclosure by the specification as a whole. *See e.g. Application of Wertheim, supra* at 265.

 43. A claim for a product defined by the process of making the product, or product-by-process claim, is proper and not indefinite when the product is not fairly susceptible to description by its properties or structure. *Application of Pilkington,* 56 CCPA 1237, 411 F.2d 1345, 1349 (1969). Beyond this, product-by-process claims are proper even if the product is capable of description in an allowable product claim, if the product is incapable of description by product claims which are of a different scope. *Application of Hughes,* 496 F.2d 1216, 1219 (CCPA 1974). Moreover, disclosure of a process which inherently produces a compound can be adequate support for a later claiming of the product-by-process compound. *Application of Edwards, supra* at 1352.

 44. An inventor need not understand or be able to state the theory or scientific principle underlying an invention, as long as he provides a disclosure sufficient to enable one skilled in the art to practice the invention or duplicate his efforts. *Diamond Rubber Co. of N.Y. v. Consolidated Rubber Tire Co.,* 220 U.S. 428, 435–36, 31 S.Ct. 444, 447–48, 55 L.Ed. 527 (1911); *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569–70 (Fed. Cir.1983); *Application of Isaacs,* 52 CCPA 1791, 347 F.2d 887, 892 (1965); *Application of Libby,* 45 CCPA 944, 255 F.2d 412, 415 (1958). In this case, where the fibrous phenomenon first occurs is simply not crucial to practicing the invention. As

was well stated by the court in *Congoleum Industries, Inc. v. Armstrong Cork Co.,* 339 F.Supp. 1036, 1055 (E.D.Pa.1972), *aff'd,* 510 F.2d 334 (3rd Cir.) *cert. denied,* 421 U.S. 988, 95 S.Ct. 1991, 44 L.Ed.2d 478 (1975), addressing the issue of preciseness of a disclosure's delineation of the scope of an invention:

> [T]he determination of sufficiency must depend on the nature of the invention claimed. The patent statute contemplates the protection of bona fide inventions, whether or not those inventions are capable of precise definition. Since inventions are not always capable of descriptions in terms of exact measurements, symbols and formulas, if the claims, when read in light of the specifications, reasonably inform those skilled in the art of both the use and scope of the invention, and if the delineation is as precise as the subject matter will permit, the requirement of specificity will be satisfied.

 45. A prior application may stress an antithetical function, advantage or theory which, contrary to the purpose of § 112, actually misleads persons skilled in the art, *see e.g., Schriber-Schroth Co. v. Cleveland Trust Co.,* 305 U.S. 47, 58–59, 59 S.Ct. 8, 13–14, 83 L.Ed. 34 (1938); *General Foods Corp. v. Perk Foods Co.,* 419 F.2d 944, 949 (7th Cir.), *cert. denied* 397 U.S. 1038, 90 S.Ct. 1357, 25 L.Ed.2d 649 (1970); *Chemithon Corp. v. Proctor and Gamble Co.,* 287 F.Supp. 291, 305 (D.Md.1968), *aff'd* 427 F.2d 893 (4th Cir.), *cert. denied* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970), and describes an invention different from the one claimed. *Stearn v. Superior Distributing Co.,* 674 F.2d 539, 546–48 (6th Cir.1982). The court does not believe that to be the case here concerning the location of occurrence of fiber formation. Speculation in the parent application as to where fibers begin forming is not antithetical, nor necessarily contrary, to a claim requirement that a fibrous structure emerge from the final extrusion die. A fibrous, meat-like material results when the processing method as disclosed in the parent applica-

tion, and as claimed in the patent in suit, is properly employed. A property function, theory or advantage which is inherent in a parent application's disclosure is full support for a later recitation of that function, theory or advantage. *See In re Lange, supra,* 644 F.2d at 864; *Application of Smythe, supra,* 480 F.2d at 1384.

■ 46. A patent's disclosure complies with 35 U.S.C. § 112 if it defines the desired functional relationship, even if some experimentation is required to reproduce the invention. *Minerals Separation Ltd. v. Hyde,* 242 U.S. 261, 270–71, 37 S.Ct. 82, 86, 61 L.Ed. 286 (1916).

■ 47. Defendant's evidence, confined as it basically was to documents pertaining to experimental work at Ralston Purina in 1966, is insufficient in itself to satisfy defendant's burden of showing that one skilled in the art of 1964 would not recognize that Flier's invented process, as disclosed in the patent application, included the contested claim limitations. Evidence of subsequent testing may indeed indicate the discovery of critical limitations not possessed by the inventor at the time the earlier application was filed. *See e.g., Chemithon Corp. v. Proctor & Gamble Co., supra,* 287 F.Supp. at 302–03. However, subsequent testing by a patentee does not, in and of itself, destroy any possibility that the disclosure of an earlier application may contain sufficient descriptive support for claims later submitted and allowed. The focus must be on the language of the patent claims, and whether the application relied on reasonably conveys to persons skilled in the art the limitations contained in these claims.

■ 48. To the extent that the continuation-in-part application adds new matter, only those claims that are dependent upon the new matter are restricted to the filing date of the continuation-in-part application. *See Application of Scheiber, supra.* There is a basis in the record and plaintiff does not contend otherwise, for reaching the conclusion that certain limitations in claims 34–52 do not find descriptive

support in the 1964 application. These claims are entitled to the effective filing date of the 1966 application.

49. Claims 1–9, 14, 29–32 and 33 also do not find full descriptive support in the parent application.

■ 50. The remaining claims 10–13, 15–28 and 32 are supported by the disclosure of the 1964 application. It further appears, and defendant does not contend otherwise, that the remaining requirements of 35 U.S.C. § 120 are satisfied. Therefore, under § 120, these claims are entitled to the benefit of the filing date of application Serial No. 381, 853, filed July 10, 1964.

*Claims Entitled to the Effective Filing Date of the CIP Application are not Anticipated*

51. In addition to the claims asserted by plaintiff to be infringed, claims 3–7 and, 34–52 are in issue by reason of defendant's counterclaim for declaratory judgment of invalidity of all claims of the patent. *See Altvater v. Freeman,* 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 5552 (C.A.Fed.1983); *Kalo Inoculant Co. v. Funk Bros. Seed Co.,* 161 F.2d 981 (7th Cir.1947), reversed on other grounds, 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588 (1948); *Coe Manufacturing Co. v. Jeddeloh Bros. Sweed Mills, Inc.,* 306 F.2d 455 (9th Cir. 1962).

52. Defendant does not combine references for purposes of showing the obviousness of any differences between the invention as claimed and the disclosure of the Dutch publication. *See In re Smith,* 714 F.2d 1127, 1137 n. 13 (C.A.Fed.1983); *In re Corcoran,* 640 F.2d 1331, 1333 (CCPA 1981). Such a showing would, in any event, be difficult in view of the deficiencies of this reference. Rather, defendant offers this supplemental evidence to establish what is alleged to be the inherent teachings of an anticipating reference.

■ 53. Anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention. *Con-*

nell v. Sears, Roebuck & Co., supra, 722 F.2d at 1548; *W.L. Gore & Associates, Inc. v. Garlock, Inc., supra,* 721 F.2d 1540 (Fed.Cir.1983); *Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 771 (Fed.Cir. 1983).

■ 54. In order to constitute an anticipation under § 102, it is an absolute requirement that a prior patent or publication bear within its four corners adequate directions for the practice of the patented invention. *Milgo Electronics Corp. v. United Telecommunications, Inc.,* 189 USPQ 160, 168 (D.Kan.1976), *aff'd,* 623 F.2d 645 (10th Cir.1980), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611.

■ 55. The description of a single embodiment of broadly claimed subject matter constitutes a description of the invention for anticipation purposes. *Application of Scheiber, supra,* 587 F.2d at 62; *In re Sichert,* 566 F.2d 1154, 1165 (CCPA 1977); *Application of Lukach, supra,* 442 F.2d at 970.

■ 56. For a printed publication to constitute an anticipatory reference under § 102(b), it must contain an enabling disclosure such that one skilled in the art could take the description, combine it with his own knowledge of the particular art, and thereby be put in possession of the claimed invention. *See In re Sasse,* 629 F.2d 675, 681 (CCPA 1980); *Application of LeGrice,* 49 CCPA 1124, 301 F.2d 929, 939 (1962). *See also Downton v. Yeager Milling Co.,* 108 U.S. 466, 3 S.Ct. 10, 27 L.Ed. 789 (1883).

■ 57. The description of the printed publication must be so full, clear and exact as to enable one skilled in the art to practice the process without having to depend on either the patent or his own inventive skills. *Phillips Elec. & Pharmaceutical Industr. Corp. v. Thermal & Elecs. Industr., Inc.,* 450 F.2d 1164, 1169 (3rd Cir. 1971); *Rich Products Corp. v. Mitchell Foods, Inc.* 357 F.2d 176, 180 (2d Cir.), *cert. denied,* 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966).

■ 58. In this regard, a document that is so obscure in its terminology that conflicting theories can be deduced therefrom is too indefinite to be utilized as an anticipation. *Lever Bros. Co. v. Proctor & Gamble Mfg. Co.,* 139 F.2d 633, 641 (4th Cir.1943); *Baldwin-Southwark Corp. v. Coe,* 133 F.2d 359, 366 (D.C.Cir.1942); *Cimiotti Unhairing Co. v. Comstock Unhairing Co.,* 115 F. 524 (S.D.N.Y.1902). *See also, Novo Industri A/S v. Travenol Labs Inc.,* 677 F.2d 1202, 1208 (7th Cir. 1982). Likewise, a printed publication which merely names a new compound or substance is insufficient as an anticipation. *Application of Wiggins,* 488 F.2d 538, 543 (CCPA 1973); *Application of Brown,* 51 CCPA 1254, 329 F.2d 1006, 1010 (1964).

■ 59. It has long been settled law that when prior use or sale is relied upon to defeat the presumption arising from the grant of a patent, the evidence tending to establish such use or sale must be sufficiently clear, cogent and satisfactory as to remove all reasonable doubt thereof. *Merrill v. Builders Ornamental Iron Co.,* 197 F.2d 16, 19 (10th Cir.1952).

■ 60. As a threshhold matter, there must be evidence that a product offered for sale or sold by one other than the applicant for patent or his assignee was made by the claimed process. *E.g., W.L. Gore & Associates, Inc. v. Garlock, Inc., supra,* 721 at 1550; *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1147–48 (Fed.Cir. 1983).

■ 61. Beyond this, there must be evidence that the sale of a product was made under conditions that made knowledge of the claimed process accessible to the public. *See W.L. Gore & Associates, Inc. v. Garlock, Inc., supra* at 1549–50. Where the method or process remains secret after a sale of the product of a method or process, that sale will not bar the grant of a patent to another. *See D.L. Auld Co. v. Chroma Graphics Corp., supra* at 1147–48. *Gillman v. Stern,* 114 F.2d 28, 31 (2d Cir.1940), *cert. denied,* 311 U.S. 718, 61 S.Ct. 441, 85 L.Ed. 468 (1941); *Puget*

*Sound Salmon Egg Co. v. Shoshoni, Inc.,* 321 F.Supp. 104 (D.Idaho 1970).

■ 62. Experimental use conducted primarily to test the invention, and under circumstances which preserve the confidentiality of the invention, does not constitute a bar to patentability under § 102(b). *See TP Laboratories v. Professional Positioners, Inc.,* 724 F.2d 965, 972–73 (Fed.Cir. 1984).

■ 63. The Dutch publication does not sufficiently disclose or describe the invention of the claims entitled to the CIP application filing date to constitute an anticipation under § 102.

■ 64. Defendant has not carried its burden of proving that ADM in 1965, Swift in 1963/1965, Swift and Wenger in 1964, or Ralston in 1963–65 made a public use or sale of the invention of the claims entitled to the effective filing date of the CIP application.

### IV. *Unobviousness*

■ 65. A patent is invalid under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art. Under 35 U.S.C. § 103, the scope and content of the prior art must be determined, differences between the prior art and the claims at issue must be ascertained, and the level of ordinary skill and the pertinent art must be resolved. Against this background, the obviousness or nonobviousness of the subject matter of the patent in suit must be determined. *Graham v. John Deere Co. of K.C.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

■ 66. Obviousness under 35 U.S.C. § 103 is determined at the time the invention was made. Every effort should be made to avoid the temptation to rely on hindsight reconstruction. *Goodyear Tire and Rubber Co. v. Ray-O-Vac Co.,* 321 U.S. 275, 279, 64 S.Ct. 593, 594, 88 L.Ed. 721 (1944); *W.L. Gore & Associates, Inc. v.*

*Garlock, Inc.,* 721 F.2d 1540, 1553 (Fed. Cir.1983); *Orthopedic Equipment Co., Inc. v. United States,* 702 F.2d 1005, 1012 (Fed.Cir.1983); *Price v. Lake Sales Supply R.M., Inc.,* 510 F.2d 388, 393 (10th Cir.1974). As stated in *Price,* "Perhaps everything seems obvious with the advantage of hindsight." *Id.* at 393.

■ 67. Since the question of nonobviousness is to be determined as of the time the invention was made, defendant's contemporary tests on different extruders utilizing current technology and under different operating conditions are useless to prove the obviousness of the Flier process, particularly since the tests were performed *ex parte* and would be accorded little weight for any issue. *Carnegie Steel Co. v. Cambria Iron Co.,* 185 U.S. 403, 420–21, 22 S.Ct. 698, 705–06, 46 L.Ed. 968 (1902); *Illinois Tool Works, Inc. v. Foster Grant Co.,* 547 F.2d 1300, 1314 (7th Cir.1976), *cert. denied,* 431 U.S. 929, 97 S.Ct. 2631, 53 L.Ed.2d 243 (1977).

■ 68. It has consistently been held that even a showing that each of the elements of the patent in suit existed in prior art is, by itself, inadequate to demonstrate obviousness when a combination of those coexisting elements results in novel, unanticipated or long-sought results. *United States v. Adams,* 383 U.S. 39, 51, 86 S.Ct. 708, 714, 15 L.Ed.2d 572 (1966); *King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc.,* 354 F.2d 533, 536–37 (10th Cir.1965); *U.S. Philips Corp. v. National Micronetics, Inc.,* 550 F.2d 716, 723–24 (2d Cir.), *cert. denied* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977); *Santa Fe-Pomeroy, Inc. v. P & Z Co.,* 569 F.2d 1084, 1094 (9th Cir.1978). Section 103 expressly mandates that the inquiry into patentability must be drawn toward the subject matter as a whole. *See Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1549 (C.A.Fed.1983); *Schenck v. Nortron Corp.,* 713 F.2d 782, 785 (Fed.Cir.1983). While the court rejects defendant's suggestion that a synergistic effect is necessary for patentability, and that combination patents

are inherently suspect, *Chore-time Equipment v. Cumberland Corp.*, 713 F.2d 774 (Fed.Cir.1983); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed.Cir.1983), the fact that an invention does produce unusual or surprising results further supports a conclusion of nonobviousness. *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1150 (Fed.Cir.1983); *Stratoflex, Inc. v. Aeroquip Corp., supra* at 1540.

■ 69. In determining the nonobviousness of an invention under § 103, since the inquiry is whether the invention as whole would have been obvious at the time the invention was made, the test is not "obvious to try," as this disregards the invention as a whole concept. *See In re Yates,* 663 F.2d 1054, 1057 (CCPA 1981); *Application of Goodwin,* 576 F.2d 375, 377 (CCPA 1978), *aff'd,* 599 F.2d 1060 (CCPA 1979); *Novo Industri A/S v. Travenol Labs, Inc.*, 677 F.2d 1202, 1208 (7th Cir. 1982).

■ 70. Secondary factors should be weighed to assist the court in determining whether an invention is obvious. *Graham v. John Deere Co. of K.C.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966); *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d at 1579 (Fed.Cir.1983); *Application of Mageli,* 470 F.2d 1380, 1383 (CCPA 1973). The Court of Appeals for the Federal Circuit has referred to consideration of objective evidence of nonobviousness as the fourth inquiry under the *Graham v. John Deere Co.* analysis. *Connell v. Sears, Roebuck & Co., supra* 722 F.2d at 1549. When such evidence appears in the record, it should always be considered. *W.L. Gore & Associates, Inc. v. Garlock, Inc., supra,* 721 F.2d at 1555; *Stratoflex, Inc. v. Aeroquip Corp., supra,* 713 F.2d at 1538; *In re Sernacker,* 702 F.2d 989, 996 (Fed.Cir.1983). However, a caveat in determining the weight to be given objective evidence is that there be a nexus between the merits of the claimed invention and the evidence offered. *Stratoflex, Inc. v. Aeroquip Corp., supra* at 1539.

■ 71. That the invention of the patent-in-suit enjoyed substantial commercial success indicates nonobviousness. *W.L. Gore & Associates, Inc. v. Garlock, Inc., supra,* 721 F.2d at 1555; *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 655 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Application of Sponnoble,* 56 CCPA 823, 405 F.2d 578, 587 (1969); *Application of McLaughlin,* 58 CCPA 1310, 443 F.2d 1392, 1395 (1971). Defendant's sales are a portion of the proof of the commercial success factor to be considered by the court in its determination of nonobviousness. *Rohm and Haas Co. v. Owens-Corning Fiber Glass Corp.*, 196 U.S.P.Q. 726, 733 (N.D.Ala.1977).

■ 72. That others in the art attempted to solve the same problems and did not arrive at the solutions claimed by the patent indicates that invention rather than the exercise of ordinary skill is present. *Environmental Designs v. Union Oil Co. of Cal.*, 713 F.2d 693, 697 (C.A.Fed.1983); *Milgo Electronic Corp. v. United Telecommunications, Inc.*, 189 USPQ 160, 169 (D.Kan.1976), *aff'd,* 623 F.2d 645 (10th Cir.) *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Lockheed Aircraft Corp. v. U.S.*, 213 Ct.Cl. 395, 553 F.2d 69, 78 (1977); *Application of Sponnoble,* 56 CCPA 823, 405 F.2d 578, 587 (1969).

■ 73. That the invention of the patent-in-suit was a discovery in disregard of principles accepted by experts in the field indicates that the invention of the patent was not obvious. *United States v. Adams,* 383 U.S. 39, 52, 86 S.Ct. 708, 714, 15 L.Ed.2d 572 (1966).

■ 74. Recognition by the accused infringer that the patented invention is truly meritorious is a "positive test" bearing on patent validity. *Sel-O-Rak Corp. v. Henry Hanger & Display Fixture Corp. of America,* 232 F.2d 176, 178–79 (5th Cir.) *cert. denied,* 352 U.S. 870, 77 S.Ct. 95, 1 L.Ed.2d 76 (1956); *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 211 USPQ 788,

799 (E.D.Wis.1981); *Colt Industries Operating Corp. v. Index-Werke KG*, 205 USPQ 990, 1002 (D.D.C.1979); *Tracor, Inc. v. Hewlett-Packard Co.*, 182 USPQ 340, 359 (N.D.Ill.1974), *aff'd*, 519 F.2d 1288 (7th Cir. 1975).

75. In determining the nonobviousness as well as the novelty of a claimed process, it is necessary that the process be looked at as a whole, considering also the starting materials utilized and parameters ascribed to them. *In re Coleman*, 621 F.2d 1141, 1144–45 (CCPA 1980); *Application of Geerdes*, 491 F.2d 1260, 1263–64 (CCPA 1974); *Application of Boe*, 505 F.2d 1297, 1299 n. 5 (CCPA 1974); *Application of Naylor*, 54 CCPA 902, 369 F.2d 765, 758 (1966). Further, the unexpectedness of the product produced by the process is to be considered along with the starting materials in determining the nonobviousness of the invention. *See Application of Geerdes, supra; Application of Naylor, supra*, 369 F.2d at 768. It is only when the process is wholly unaffected by the starting materials utilized that the starting materials are not to be considered as part of the process. *In re Coleman, supra; Application of Geerdes, supra; Application of Way*, 514 F.2d 1057, 1063 (CCPA 1975) (concurring opinion); *Application of Kanter*, 55 CCPA 1395, 399 F.2d 249 (1968).

76. The invention of the asserted claims of the Flier patent was unobvious over the prior art raised by defendant. In addition, the defendant has not carried its burden of proving obviousness of the remaining non-asserted claims of the patent-in-suit.

## V. *Infringement*

77. In determining whether an accused composition or process infringes a valid patent, resort must be had in the first instance to the words of the claim. If an accused matter falls clearly within the claim, infringement is made out and that concludes the matter. *Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed.

1097 (1950); *King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc.*, 354 F.2d 533, 540 (10th Cir.1965); *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 205 USPQ 421, 426 (W.D.Okla.1979), *aff'd*, 645 F.2d 847 (10th Cir.1981).

78. A patentee is entitled to the broadest construction of its claims consistent with the prior art and with the Patent and Trademark Office history of his patent where the invention has had great practical impact on the art, and where the infringer has relied on the patentee's teaching to derive his own product. *Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523 (1923).

79. An infringer does not escape liability by merely adding features or impairing or improving on the patentee's invention. *Temco Electric Motor Co. v. APCO Mfg. Co.*, 275 U.S. 319, 328, 48 S.Ct. 170, 173, 72 L.Ed. 298 (1928).

80. The patent-in-suit is pioneering in nature and is therefore entitled to broad and liberal construction. *See Thomas & Betts Corp. v. Litten Systems, Inc.*, 720 F.2d 1572, 1580 (Fed.Cir.1983); *Swanson v. Unarco Industries, Inc.*, 479 F.2d 664, 669 (10th Cir.1973), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483; *Corning Glass Works v. Anchor Hocking Glass Corp.*, 374 F.2d 473, 476 (3d Cir.), *cert. denied*, 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967). A pioneer patent is one covering a process of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 561–62, 18 S.Ct. 707, 718–19, 42 L.Ed. 1136 (1898).

81. Infringement is made out under the doctrine of equivalents when the accused process performs substantially the same function in substantially the same way to obtain the same result as the patented invention. *Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 339 U.S.

605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). "To permit imitation of a patented invention which may not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing." *Id.* at 607, 70 S.Ct. at 856.

82. A patent claim is not limited to a preferred embodiment set forth in the specification. If this were so most patents would be of little worth. *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 418, 28 S.Ct. 748, 751, 52 L.Ed. 1122 (1908); *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 869 (5th Cir. 1973), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485.

83. An inventor can be his own lexicographer. The function of the claims is to define the scope of the invention; it is not their function to describe the embodiment. *Milgo Electronic Corp. v. United Telecommunications, Inc.*, 189 USPQ 160, 168 (D.Kan.1976), *aff'd*, 623 F.2d 645 (10th Cir.1980), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611.

84. It has always been the rule that patents should be liberally construed, with a view of protecting the invention which the patentee intended to secure. That interpretation which sustains and vitalizes the grant should be preferred to that which strikes down and paralyzes it. *Johns-Manville Corp. v. National Tank Seal Co.*, 49 F.2d 142, 146 (10th Cir.1931), *cert. denied*, 284 U.S. 654, 52 S.Ct. 33, 76 L.Ed. 555.

85. It is fundamental that the claims must be interpreted in light of the specification, *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966); *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110 (Fed.Cir.1983), and the file wrapper, *Astra-Sjuco, A.B. v. U.S. Int'l Trade Comm'n*, 67 CCPA 128, 629 F.2d 682 (1980); *Jamesbury Corp. v. United States*, 183 USPQ 484, 489–90 (Ct. Cl.1084), *aff'd*, 207 Ct.Cl. 516, 518 F.2d 1384 (1975), and both are to be read with a view to ascertaining the invention.

86. Even though a patent claim makes use of terminology which has a very specific common or technical meaning, the meaning of that term as used in the claim must be that assigned to it by the patentee rather than its common or technical meaning. *See, e.g., Hinde v. Hot Sulphur Springs, Colorado*, 359 F.Supp. 987 (D.Colo.1972), *aff'd*, 482 F.2d 829 (10th Cir. 1973); *Johns-Manville Corp. v. National Tank Seal Co.*, 49 F.2d 142 (10th Cir.1931), *cert. denied*, 284 U.S. 654, 52 S.Ct. 33, 76 L.Ed. 555.

87. Courts should not accept an interpretation of the claim terms which would prevent the claims from covering the only specific example in the patent or from reading on the structure described therein. *Canaan Products, Inc. v. Edward Don & Co.*, 388 F.2d 540, 544 (7th Cir.1968).

88. A patentee is not required to understand the scientific principle or theory of operation underlying his invention. *Diamond Rubber Co. of N.Y. v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 435–36, 31 S.Ct. 444, 447–48, 55 L.Ed. 527 (1911); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570 (Fed.Cir.1983).

89. In fact, even if the patentee makes an actual mistake in the theory and functionality of structure recited in the specification or in the claims, it is not necessarily fatal to a finding of infringement of the claims. *See Katz v. Horni Signal Mfg. Corp.*, 145 F.2d 961, 963 (2d Cir.1944), *cert. denied*, 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432 (1945); *Aerosol Research Co. v. Scovill Mfg. Co.*, 137 USPQ 701, 724 (N.D. Ill.1963), *modified on other grounds*, 334 F.2d 751 (7th Cir.1964). *Cf. Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956 (Fed.Cir. 1983) (a claim containing a limitation impossible to meet does not enable, and where a claim requires a means for accomplishing an unattainable result, the claimed invention must be considered inoperative as claimed).

90. What is required is that the inventor make a disclosure sufficient enough to enable one skilled in the art to practice the invention or duplicate his efforts. *See Eames v. Andrews*, 122 U.S. 40, 56, 7 S.Ct. 1073, 1082, 30 L.Ed. 1064 (1887); *Application of Isaacs*, 52 CCPA 1791, 347 F.2d 887, 892 (1965); *Erie Resistor Corp.*

v. *United States*, 150 Ct.Cl. 490, 279 F.2d 231, 234 (1960); *Application of Libby*, 45 CCPA 944, 255 F.2d 412, 415 (1958).

91. It is well settled that a party cannot avoid infringement merely by having a third party practice one or more of the required steps. *Crowell v. Baker Oil Tools, Inc.*, 143 F.2d 1003, 1004 (9th Cir. 1944), *cert. denied*, 323 U.S. 760, 65 S.Ct. 93, 89 L.Ed. 608; *Shields v. Halliburton Co.*, 493 F.Supp. 1376, 1389 (W.D.La.1980), *aff'd*, 667 F.2d 1232 (5th Cir.1982); *Metal Film Co. v. Metlon Corp.*, 316 F.Supp. 96, 110 (S.D.N.Y.1970). Defendant maintains or controls the pH of the soybean starting material used in its process within the meaning of the asserted claims.

92. Only in situations where a claim construction would resurrect subject matter surrendered during prosecution does the doctrine of file wrapper estoppel preclude the patent owner from obtaining such a claim construction. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362 (Fed.Cir.1983).

93. Different commercial grades or concentrations of the same material are equivalents if they provide the same function and result in the invention. *Carboline Co. v. Mobil Oil Corp.*, 301 F.Supp. 141, 151 (N.D.Ill.1969).

94. The motive or intent of defendant is immaterial to the question of infringement. *Milgo Electronics v. United Telecommunications, Inc.*, 189 USPQ 160, 169 (D.Kan.1976), *aff'd*, 623 F.2d 645 (10th Cir.1980), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611.

95. Plaintiff has carried its burden of proving that the manufacture, use and sale of defendant's Ultra-Soy infringes claims 1, 2, 8–20, 22, 23, 25 and 29–33.

VI. *Willful Infringement/Attorney Fees*

96. Title 35, United States Code, Section 284, provides the trial court in patent cases with discretion to increase the damage award to the plaintiff where the defendant's conduct is intentional, willful and made with reckless disregard of the plaintiff's patent rights.

97. An award of increased or treble damages is a matter committed to the discretion of the trial court under this statute. *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 665 (10th Cir.1980), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611.

98. Failure to obtain advice from independent patent counsel is an indication of the willfulness of the infringement. *Novo Ind. A/S v. Travenol Labs, Inc.*, 221 USPQ 379, 386–87 (N.D.Ill.1981), *aff'd*, 677 F.2d 1202, 1211–12 (7th Cir.1982); *General Electric Co. v. Sciaky Bros., Inc.*, 415 F.2d 1068, 1073 (6th Cir.1969); *Hinde v. Hot Sulphur Springs, Colorado*, 359 F.Supp. 987, 1001 (D.Colo.1972), *aff'd*, 482 F.2d 829 (10th Cir.1973); *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 211 USPQ 788, 798 (E.D.Wis.1981). In fact, failure to obtain advice of counsel alone can prove the willfulness of the infringement. *Trio Process Corp. v. Goldstein's Sons, Inc.*, 461 F.2d 66, 75 (3d Cir.1972), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262.

99. The court finds the evidence establishes willful infringement by defendant warranting the increase of damages to be awarded to plaintiff. The court does not make this finding based on Far-Mar-Co's activities prior to issuance of the patent-in-suit. Rather, the court focuses on conduct after issuance of the patent, particularly the decision to respond to plaintiff's offer of a license without consulting patent counsel (*see* Tr.Tr. 1286–90).

100. Under 35 U.S.C. § 285, the court may also in exceptional cases award reasonable attorney fees to the prevailing party. The court, however, declines to do so in this case. While infringement is here deemed willful, many potential defenses were available due to the lengthy, and contested, nature of the patent's history. Many issues remained unresolved for years due, in part, to the Peoria settlement.

VII. *Relief Granted*

101. Plaintiff is entitled to an accounting for all damages suffered by it as a

result of Far-Mar-Co's infringement of asserted claims of United States Patent No. 3,940,495 which are herein all found to be valid. 35 U.S.C. § 284. The court reserves ruling on the amount to which damages may be increased pursuant to the provisions of 35 U.S.C. § 284.

102. Defendant Far-Mar-Co, Inc., its officer, employees, and agents and those in privity with them are hereby enjoined from infringing claims 1, 2, 8–20, 22, 23, 25 and 29–33 of United States Patent No. 3,940,-495 by the manufacture, use and sale of its Ultra-Soy product, pursuant to 35 U.S.C. § 283.

103. Defendant's counterclaim of invalidity of all claims United States Patent No. 3,940,495 is denied.

104. Plaintiff's request for attorney fees pursuant to 35 U.S.C. § 285 is also denied.

IT IS SO ORDERED.